## THOMSON v. PEAKE.

1. FEE DEFEASIBLE—CASE CRITICISED.—A devise to three sons, to be equally divided between them, with the subsequent direction, that the lands so devised shall be held by them during their natural lives, but should any of them die without having any heir or heirs of their bodies, then the share of such son shall go over, gives each son's share of the estate to him and his heirs ; but if he died without issue, then it was to go over—a fee defeasible.   Carson *v.* Kennerly, 8 Rich. Eq., 259, approved.

2. JOINT DEED—UNEQUAL PAYMENTS.—The land received by one of these sons having been mortgaged by him to A and B at the same time, A's mortgage assigned to C, the mortgagor's wife, the land sold under the two mortgages, and purchased by B and C, who paid therefor by a proportionate credit on their respective mortgages, and took deed to themselves jointly and in equal portions—B and C became seized of all the estate of the mortgagor, but in equal shares, and not in the proportions they had paid of the purchase money.

3. TRUST DEED—INTERESTS OF BENEFICIARIES.—And B having thereafter conveyed his moiety to C, in trust for herself and children, that is to say, to receive the income and profits during her life, and to apply them to the use and benefit of herself and her children now or afterwards born, and upon her death the trust to determine, and the property to belong to such children—gave the interest in B's moiety to C and her children for C's life, and then to her children absolutely.

4. IBID.—ESTATE CONVEYED—ASSIGNMENT OF INCOME.—A subsequent deed by C to P., in trust for herself for life, with remainder to her children, carried the moiety purchased in the estate by C at the foreclosure sale, but was inoperative to convey the other moiety held by C as trustee, as no such power was given to the trustee, except to the extent of assigning her share of the rents and profits of this last mentioned moiety.

5. RENTS—TENANTS IN COMMON—TRUSTEE—CASE CRITICISED.—And this trustee P. having entered into possession of this tract of land, he was properly in possession as a tenant in common with C's children, and, therefore, liable to C and her children only for net rents and profits actually received, and not for rental value.   Jones *v.* Massey, 14 S. C., 292, recognized and followed.

6. ACCOUNTING BY TRUSTEE—ACQUIESCENCE.—This trustee should be allowed, in his accounting, necessary disbursements for taxes, improvements, &c., but, as against the children, not for judgments against C, paid under the direction of her trust deed, nor for mules hired from himself; and as to this latter charge, it was allowed against C only because of her knowledge and consent.

7. DECREE—UNBORN BENEFICIARIES.—In framing a decree, care should be taken to protect the interests of the unborn children.

8. TRUSTEE—BALANCE DUE.—If a balance is found in favor of the trustee as against C, the trustee is entitled to a decree for such balance to be paid out of C's interest by the trustee's successor in the trust.

9. PETITION FOR REHEARING refused.

Before HUDSON, J.. Union, October, 1891.

Action by the children of Jessie M. Thomson against Glenn D. Peake, trustee, and Jessie M. Thomson. The master's findings were as follows:

*Conclusions of Law:* I. That W. Waddy Thomson took under his father's said will a fee defensible in Beauty Spot plantation, subject to be defeated upon his dying without heir or heirs of his body.

II. That by virtue of a sale, under two mortgages, of said plantation, given by him to the late J. S. R. Thomson and Albert G. Means, respectively, to secure the payment of eight hundred and twenty-seven 70-100 dollars to the former, and one thousand and nine 99-100 dollars to the latter, that the defendant, Jessie M. Thomson, became the owner of the undivided 663-1630 portion thereof, and the said Albert G. Means became the owner of the remaining 967-1630 undivided portion thereof. And that each took in said portions all interest that the said W. Waddy Thomson had in said plantation under his father's will.

III. That by virtue of a deed, dated the first day of May, 1880, by Albert G. Means to Jessie M. Thomson, and the plaintiffs, for their joint use during the lifetime of the said Jessie M. Thomson, the rents and profits to be enjoyed by them in equal portions. And that by its terms the fee in that portion of the land passed to the plaintiff. And the defendant, Jessie M. Thomson, became only the trustee, to manage that portion of the lands, and receive and apply the rents and profits in the manner aforesaid.

IV. That by virtue of a deed, on the first day of January, 1887, by Jessie M. Thomson to the defendant, Glenn D. Peake, all interest that she held in her own right in said land passed to the defendant, Glenn D. Peake, in trust, for the use of the

said Jessie M. Thomson and the plaintiff, and after born children, in equal portions, during the lifetime of said Jessie M. Thomson, and at her death the fee in remainder vests in her surviving children.

V. That the defendant, Jessie M. Thomson, committed a breach of her trust, in attempting to make the defendant, Glenn D. Peake, a trustee for the aforesaid interest conveyed to her in trust for the plaintiffs under the said Albert G. Means' trust deed.

VI. That the defendant, Glenn D. Peake, by his own act became trustee in his own wrong of the said trust interest of the plaintiffs under the Means deed.

VII. That all items charged in the accounts of Glenn D. Peake, as trustee, as against the plaintiffs, for the purchase of mules and furnishing the family, as well as advancements made to tenants who were renters, should not be allowed. But that a reasonable annual hire for each mule should be allowed, where the same were used on said plantation by laborers, as distinguished from renters.

VIII. That no portion of the rents and profits of the plaintiffs, under the said Means deed, could be legally applied towards the payment of the debts that Mrs. Thomson owed at the time of her said trust deed to Glenn D. Peake. But it is recommended, for the reason stated heretofore, that it be allowed; but that the plaintiffs should have their decree against her for said portion so applied.

IX. That the plea of the statute of limitations to the note held by Glenn D. Peake against Mrs. Thomson at the time of the execution of said trust deed to him, can not be sustained.

X. That the defendant, Glenn D. Peake, committed a breach of his trust in applying the rents and profits of the plaintiffs in the manner as stated in the foregoing seventh paragraph of these conclusions.

XI. That the defendant, Jessie M. Thomson, should be held liable to the trustee for her proportionate share of all moneys and supplies advanced to her by said trustee, as well as for the value of the mule, known as the "Goforth mule," sold in the fall of 1888, by her directions.

XII. That it is necessary that a trustee be appointed to take charge of the entire property of the plaintiffs.

I find as conclusions of fact:

I. That the defendant, Glenn D. Peake, took charge of the entire plantation, known as "Beauty Spot," in January, 1887, and a little personal property on the same, consisting mostly of farming implements, and has remained continuously in the possession thereof to the present time.

II. That he was indebted to the plaintiffs the 1st of January, 1891, in the sum of forty-three 90-100 dollars, as shown by "Exhibit A."

III. That the sum of three hundred and fifteen 44-100 dollars, interest calculated to the 1st of January, 1891, of the plaintiff's share of the rents and profits under the said Means deed, was applied by the trustee towards payment of debts that Mrs. Thomson owed at the time of the execution of her said trust deed, as shown by "Exhibit A."

IV. That the defendant, the said Mrs. Thomson, was indebted to the defendant, Peake, as her trustee, on the 1st day of January, 1891, in the sum of one hundred and sixty-three 54-100 dollars, as shown by "Exhibit B."

V. That the value of the mule, known as the "Goforth mule," in the fall of 1888, was the sum of eighty dollars.

VI. That an annual hire of a mule is the sum of twenty-five dollars.

VII. That the share of the plaintiffs in the rents and profits, under the Means deed, is the 1043–2445 part thereof.

VIII. That the remaining share of the rents and profits, to wit: the 1402–2445 part thereof, passed to the plaintiffs and the defendant, Jessie M. Thomson, by her trust deed to Peake, in equal portions.

IX. That the defendant's (Jessie M. Thomson) entire share of the rents and profits of said plantation is the 701–7335 part thereof, and the remaining 6634–7335 part thereof vests in the plaintiffs, in equal portions.

X. That the defendant, Jessie M. Thomson, owed the note for $250 given by her to the defendant, Glenn D. Peake, with interest, at the time of the execution of her trust deed, and

that it should be paid in the manner as shown by "Exhibit A."

XI. That there was a quantity of corn, fodder, cotton seed, &c., on the plantation on the 1st of January, 1891, belonging to the trust estate, which was used in the production of the crops for 1891, which is yet to be gathered and accounted for.

J. Y. CULBREATH, *Special Master.*

Upon exceptions to this report, the following decree was rendered:

After a careful examination of the whole case, I have modified somewhat the views I briefly expressed at the close of the argument.

Whether W. Waddy Thomson, the father of the plaintiffs, took, under the will of his father, Henry Thomson, a life estate, or an estate in fee simple defeasible, it seems to me, does not affect the matters at issue between the trustee, Glenn D. Peake, and the plaintiffs. The mode, and manner, and principle of the accounting of the trustee are the same, whether the devise to Waddy was for life or in fee. It is needless, therefore, to trouble ourselves with that inquiry in this case, although I am inclined to think that the devise to W. Waddy Thomson is for life only. Be this as it may, his estate was sold under mortgage, and has, by purchase, vested in his wife, Jessie M. Thomson, a co-defendant of Glenn D. Peake, and, so far as she could, she has conveyed the same to the said Peake in trust, out of the rents and profits of the Beauty Spot plantation, to pay her debts, and to support herself and children, who are the plaintiffs. They now apply to this court, as beneficiaries under this deed, for relief against their trustee, charging him with mismanagement, asking that he do account for his actings and doings, and praying that he be removed and a successor be appointed.

Under the deed of trust, Glenn D. Peake took charge of Beauty Spot plantation in January 1, '87, and ever since has managed the same, and all he has to account for is the rents, issues, and profits of the same. No accounting for the year 1891 was taken by the master, because the references closed

before this could be done.  The accounting covers the transactions of the years 1887, 1888, 1889, and 1890.  Glenn D. Peake lives in the County of Union, about thirty miles distant from the Beauty Spot plantation, which is a very valuable plantation, in the County of York.  Instead of renting the place out, which, according to the evidence, he could have done to advantage, he stocked it, and undertook its cultivation by hired labor, by croppers, and by tenants.  His accounting consists of rendering a minute and detailed account of his farming operations, which, for the four years above stated, resulted in disaster rather than profit, the net profits being astonishingly small.  I think the special master has erred in taking this tedious and unsatisfactory method of accounting.  The trustee's duty was to either rent out this fine plantation, or, if he preferred to cultivate it himself, he rendered himself liable at least for reasonable rent—that is, a reasonable sum for the use and occupation of the plantation.  He was at liberty to take his choice, either to rent it out to a tenant, or tenants, at a fixed rent, or to become tenant to himself and account for fair rent.  The special master should have charged the trustee with reasonable rent each year.

He should then have given him credit for all the money he paid upon the debts of Mrs. Jessie M. Thomson, and in support of her and her children.  I am satisfied that she and her children needed all he advanced to them for their support, and more.  The terms of his trust required this of him, and it will not do to say now that their father was able to support them, and that the trustee should not have credit for what he let them have.  The evidence shows that the wife and children needed, in fact, more than they got of him (the trustee).  If it be that Mrs. Thomson had got more than her share in appropriation to her debts and to her support, then the master can adjust the matter between her and her children on a fair and equitable basis, but the trustee must have credit for all he let them have.  He also must be allowed his commissions, and I find nothing in the evidence showing that he renounced them.  This basis of accounting I deem right and fair, and it will eliminate from

the itemized account nearly all the small items in dispute, and will greatly simplify the statement.

It is, therefore, ordered, adjudged, and decreed, that the accounts for the period of the trusteeship, including the year 1891, be stated on this principle, and that it be recommitted to the special master to hold reference, hear testimony, and restate the accounts, as herein directed, and also to take testimony and report to the court a fit and suitable person to act as trustee in lieu and stead of Glenn D. Peake. All exceptions at variance with this decree are overruled, but any small item of the accounting not eliminated by the mode of accounting herein directed is left open for adjustment on the restatement of accounts.

*Messrs. D. A. Townsend* and *David Johnson, jr.*, for appellant.

*Messrs. William Munro, Stanyarne Wilson*, and *W. W. Thomson*, contra.

March 17, 1893.   The opinion of the court was delivered by

MR. JUSTICE POPE.   The children of W. W. Thomson and Jessie, his wife, five in number, by their guardian *ad litem*, the said W. W. Thomson, have instituted this action against the defendants, Glenn D. Peake, and the said Jessie M. Thomson, to procure an account and settlement of the rents and profits of a certain plantation of land, situated in York County, in this State, known as "Beauty Spot," containing 693 acres, from January, 1887, during the time when the defendant, Glenn D. Peake, controlled the same, and also for his removal from the office of trustee in connection with said lands. The answer of Glenn D. Peake denies that he is indebted, or that the relation of trustee should be terminated until the debts and obligations of the parties to the suit, growing out of his connection with said lands as trustee, are fully paid. The answer of the defendant, Mrs. Jessie M. Thomson, is in accord with the allegations of the complaint.

By consent, all the issues of law and fact were referred to James Y. Culbreath, Esq., as special master. The matters were heard by him, and a report thereon was made to the Cir-

cuit Court.   Exceptions thereto were heard by Judge Hudson, and his decree pronounced.   Thereafter an appeal was taken by Glenn D. Peake, and is now before this court, upon the following grounds: 1. That his honor erred in finding that this defendant could have rented the "Beauty Spot" plantation to advantage.   2. That his honor erred in not sustaining the method of accounting adopted by the special master—that is to say, that his honor erred in not holding that the receipts and disbursements of the defendant, trustee, were the true measure of his liability.   3. That his honor erred in holding that this defendant, by cultivating this plantation, rendered himself liable for a reasonable rental value, without reference to the result of the farming operations.   4. That his honor erred in not holding and finding, as a matter of fact, that this defendant did rent out all of this plantation that he was able to rent, and only cultivated, on shares, any part of it because he was obliged to, or allow that much of the trust estate to remain idle and entirely unproductive.

Financial embarrassment, consisting in an inability to utilize, as a matter of profit, a valuable plantation in the County of York, in this State, known as "Beauty Spot," bare as it was of provisions, work animals, and farming utensils, wagons, &c., without money, or the means of obtaining it, harassed by claims already in judgment, and others not yet sued upon, led the defendant, Mrs. Jessie M. Thomson, to apply to her uncle by marriage, the defendant, Glenn D. Peake, who was himself a large planter and a practical business man, with means and credit, to take charge of her landed estate as her trustee, and from the proceeds pay her taxes past due, the demands against her already in judgment, and others not in judgment, as well as to supply the means for the support of herself and her children, the present plaintiffs.   After much persuasion, the defendant Peake consented—the father and mother of plaintiffs both alleging that Mrs. Thomson was the owner of a life estate in said lands.

The terms of the trust deed were as follows: "All my right, title, and interest in all real estate and personal property owned by me or in my possession, or in which I have any interest

whatever. Amongst said real estate is the 'Beauty Spot' plantation'' (then follows a description of it); "also, my homestead house and lot in Gaffney City. To have and to hold, all and singular the premises before mentioned, unto the said Glenn D. Peake, his heirs and assigns, forever; but, nevertheless, upon the following expressed trust, and to and for the uses, interests, and purposes hereinafter limited, described, and declared: that is to say, upon trust to receive the issues, rents, and profits of the said premises, and with leave, if necessary and expedient, to sell whatever is necessary and expedient, to pay the debts for which I am legally liable, and then to apply said property, or all the issues, rents, and profits, or proceeds in any way thereof, after paying all necessary expenses in making or using the same, as aforesaid, including payment of taxes, to the use of myself and my children now living or hereafter born; he, the said Glenn D. Peake, making the necessary outlay for said purposes during the term of his natural life, and then to convey said property, upon like trusts, to another trustee, to be selected by me, and upon my death that said Glenn D. Peake, or his successor, shall convey in fee to my children then living all of said property remaining in, or coming into, his hands or control by reason of (this) conveyance.''

Immediately upon the execution of this trust deed, Glenn D. Peake paid the judgment against Mrs. Thomson, held by R. C. Thomson, for $213.85, and the taxes past due in York and Spartanburg Counties, amounting to $85. All parties, Mr. and Mrs. Thomson, and Mr. Peake, exerted themselves to get tenants for that year (1887). No doubt, handsome returns would have been the result of these joint efforts, but for the disastrous freshets in all the streams of the State in that year, whereby the labor and hopes of those tilling the soil—especially river and creek bottoms—were blasted. This was known to the parties as early as the 17th of August, 1887, for, at that date, Mr. Thomson writes to Mr. Peake, and admits notice of the effect of the floods of water. The crops only amounted that year to $232, while the account of the trustee for moneys paid out by him was $550.14. In 1888, receipts were $957.37, disbursements (including $59.30 on Gaddes judgment, S. M.

McNeil, bill for supplies to Mrs. Thomson and family, $322.81), were $652.32. In 1889, receipts were $965.36; disbursements (including supplies to family, $337.40,) were $735.66. In 1890, receipts were $912.80; disbursements were $352.91. In 1890, this action was commenced.

The plaintiffs having alleged that they were tenants in common with their mother, Mrs. Thomson, and this allegation being denied, it became necessary to inquire into the title in the lands known as "Beauty Spot." The special master very properly submits as a part of his report so much of the will of the late Henry H. Thomson, who died after 1853, as bears upon this matter, as well as the deed of Albert G. Means and Jessie M. Thomson, and also the deed from Albert G. Means to Mrs. Jessie M. Thomson. The relevancy of these same instruments will be manifest when it is stated that William Waddy Thomson received "Beauty Spot" under the will of his father, H. H. Thomson; that he, William Waddy Thomson, mortgaged the said "Beauty Spot" to J. S. Rowland Thomson and Albert G. Means, each separately, and that Mrs. Jessie M. Thomson was the assignee of the mortgage held by J. S. Rowland Thomson; that the said mortgages contained a power of attorney to mortgagees to sell in case of default, and that upon default of payment they did sell said lands, and themselves became the purchasers (as was permitted by the terms of their deeds of mortgage), and title was made to them jointly; and that thereafter Albert G. Means conveyed his interest in said lands to his daughter, Mrs. Jessie M. Thomson, in trust for herself and children during her life, and at her death to vest absolutely in such children.

We will inquire (*a*) what estate in such lands W. W. Thomson took under the will of his father, H. H. Thomson; (*b*) what estate Albert G. Means and Jessie M. Thomson took under the deed from W. W. Thomson; (*c*) what estate Jessie M. Thomson and her children took under the deed from Albert G. Means to the said Jessie M. Thomson; (*d*) what estate passed from Jessie M. Thomson to Glenn D. Peake under her deed to him in 1887.

(*a*) The provisions of the will of H. H. Thomson, bearing upon the quality and quantity of the estate created thereunder

for his son, William Waddy Thomson, are in these words: "I give, devise, and bequeath to my three sons, H. H. Thomson, jr., J. S. Rowland Thomson, and William Waddy Thomson, all my real estate, lying in York and Union Districts, to be equally divided between them, share and share alike." [Then follows a description of such lands, one tract of which is "Beauty Spot."] "The above described lands willed to my three sons, I wish to be divided in the following manner." [Then follows a description of the manner in which the division was to be made, and by this manner of the division as fixed by said will, "Beauty Spot" was assigned and received by William Waddy Thomson.] But in another part of the will these words occur: "And it is my will and desire that my three sons, H. H. Thomson, jr., J. S. Rowland Thomson, and William Waddy Thomson, shall have all my lands in York and Union Districts, as above described and willed to them, to be held by them during their natural lives or life, and that my son, Richard Lewis Thomson, to whom I have willed Pacolet lands, as above described and willed, to him during his natural life. But should any of my four sons die without having any heir or heirs of their bodies, lawfully begotten by them, then the share or shares so willed to them shall be equally divided, share and share alike, among their brothers and sisters then alive, or should any of my children be dead, leaving lawful heirs of their bodies, lawfully begotten, then the said child or children shall take the share amongst them which their deceased parent would take were he then living."

As remarked by the special master, in his very able report, "the limitations of estates involve the most abstruse principles of the law." It will be noticed, in the provisions of the will, that no estate is fixed upon the heirs or issue of the body of the first taker. Under the statute in this State, where a devise is made to A, and no such words as heirs and assigns, or kindred words, are engrafted upon the devise, the first taker takes a fee simple, unless such estate is inconsistent with other parts of the will. The testator here, when he first devises his lands in York and Union Districts to his three sons, H. H., jr., J. S. Rowland, and William, simply devises the

lands to them by name, in certain parcels, and, as before re-marked, under our law, if no other words had occurred, the first takers would be vested with fee simple estates. But the testator, in another provision, has said that if any one or more of his four sons shall die without issue lawfully begotten, then over, saying, just before the last recited language, that said sons should hold the lands devised to them during their natural lives. Do these after added words affect the devise so as to reduce the fee simple estate? Very certainly they do. But do these words reduce the estate to a simple life estate? We think not. We are inclined to agree with the special master that the decision of our court of last resort in the case of *Carson* v. *Kennerly*, 8 Rich. Eq., 259, is in direct application to the case at bar.

In the case last cited, the testator used this language in his will as to Patrick Carson (and the same was made as to legacies and devises as to his other children): "I give and bequeath to my son, Patrick Carson, four negroes, Primus, Adam, Deborah, and Phœbe, with two hundred acres of land on the river tract," &c. And, in another clause of the will, he said: "I desire that all the above legacies to continue to the legatees during their natural lives; and if any of them should die without heirs of their bodies begotten lawfully, then their and every of their parts so dying without lawful issue, their parts of my estate to be equally divided among my surviving heirs." Chancellor Dargan, who delivered the opinion of the court, said: "When the testator expresses himself to the effect that the legacy should continue during the life of the legatee, he does not mean to cut down the estate in fee previously given to a life estate, but intended to engraft upon it a limitation, which was to take effect upon a contingency. The will of the testator, according to this construction, would read thus: He gave the negroes, Primus, &c., to his son, Patrick, and his heirs forever; but, if Patrick should die without lawful issue, then the estate to Patrick was to be merely a life estate; and he gave the negroes to be equally divided among his surviving heirs; *thus creating, as is by no means uncommon, an estate in fee, defeasible upon a future contingent event.*" (Italics ours.) So

we think, in the case at bar, the testator intended to give these lands to his sons and their heirs forever; but, if any one of them should die without lawful issue, then the estate of the son so dying was to be merely a life estate, and the lands should vest in fee simple in the children of testator who should survive the brother so dying without lawful issue. The estate in William Waddy Thomson was an estate in fee, defeasible upon the event of his dying without issue lawfully begotten.

(b) The estate of Albert G. Means and Mrs. Jessie M. Thomson, under the deed to them as purchasers of all the estate of William Waddy Thomson, at the sale thereof in foreclosure of their mortgage, partook of the character of the estate in their grantor—an estate in fee, defeasible upon the event of his (W. W. Thomson) dying without issue lawfully begotten. A question suggests itself as to whether the special master has not erred in his construction of this deed as between Albert G. Means and Mrs. Thomson. While it is true that the purchase money at the sale for the foreclosure of the mortgage was furnished as follows: $483.50 paid by Albert G. Means, $331.50 by Mrs. Thomson, yet the grantor in the estate conveyed by his deed made no distinction as between them, he granted the lands to them in equal portions, and we are at a loss to perceive the propriety of making any reformation of the rights of the parties to this deed in this suit, when it is not made one of the issues by the pleadings. We think, under the deed, Albert G. Means had one moiety and Mrs. Thomson the other moiety.

(c) In the recital of the facts constituting the basis of this controversy we have already set out a copy of the deed of Mrs. Thomson to the defendant, Peake, as trustee. It remains at this point to notice the provisions of the deed from Albert G. Means to Mrs. Jessie M. Thomson. He conveyed all the interest he had in "said lands to the said Jessie M. Thomson, in trust for her and her children, upon the following terms, to wit, to have and to hold all and singular the premises before mentioned unto the said Jessie M. Thomson forever, upon the trust, nevertheless, and to and for the uses and purposes hereinafter described and declared; that is to say, upon trust to

receive the issues, rents, and profits of the said premises, and
to apply the same to the use and benefit of the said Jessie M.
Thomson and the children she now has or may hereafter have
by her husband, W. Waddy Thomson; said issues, rents, and
profits to be received and applied during the term of her nat-
ural life by said Jessie M. Thomson, and upon the death of the
said Jessie M. Thomson, the said trust shall cease and forever
determine, and the lands and premises above described shall
belong in fee simple, free and discharged from all trust what-
ever, to the children of the said Jessie M. Thomson and W.
Waddy Thomson, which they now have or which may hereafter
be born to them, their heirs and assigns forever."

It is very clear from the terms of this deed that the fee is
placed, not in Mrs. Thomson, but in her children already born
or hereafter to be born, by her husband, W. Waddy Thomson.
The only interest vested in her is one for her life, and not only
for her life, but also to be equally for the enjoyment of her
children during her life.    As to the enjoyment of these lands,
only the rents, issues, and profits arising from the same during
her life are to be enjoyed by herself and her children. Of course,
this restricted enjoyment of such lands only applies to the one
undivided moiety derived from the deed of Albert G. Means.
She has one-half in her own right in fee defeasible, and one-
sixth of the other half for life.    In other words, as owner in
fee, she has title to one-half, while the fee in the other half is
in such children as she has borne or shall hereafter bear unto
her husband, W. W. Thomson, the fee in each half being de-
feasible upon the contingency of W. W. Thomson dying with-
out issue lawfully begotten.

(*d*) It follows, therefore, that in the conveyance she made in
January, 1887, to Glenn D. Peake, as trustee, that all the estate
which was carried to her said trustee under her convey-
ance was the one-half she held in her own right.   She
could not convey to such trustee any estate she received
under the deed from Albert G. Means to herself as trustee.   It
is not in the power of a trustee to convey a trust estate, in his
or her hands as such, unless such power is conferred by the
instrument creating the trust, or under an order of court in an

action between the parties whose interests are to be so affected. Not only is a trust indestructible, but it is not transferable upon the mere volition of the trustee. As far as the deed from Mrs. Thomson to Glenn D. Peake, as trustee, could operate upon the one moiety held by Albert G. Means, and conveyed by him in trust to Mrs. Thomson, it would authorize such trustee, Glenn D. Peake, to collect her share of the rents and profits and issues of "Beauty Spot" to the extent of one-sixth of one-half. Means' deed of trust was fatally silent in giving Mrs. Thomson any power to transfer the trust, and there is no pretence that any authority therefor was derived from any court.

Inasmuch as the defendant has been in the exclusive possession of "Beauty Spot" plantation since January, 1887, and has received the issues, rents, and profits derived therefrom, it remains to be considered what principle shall govern in making up his accounts therefor. It is admitted on all hands, that if one enters upon the possession of the lands of another without authority in law, and while in such possession takes to himself the rents, issues, and profits thereof, he is considered as a trespasser, and in an action therefor can be made to pay the rental value of such lands, without any regard being had as to how much less than the rental value he actually received, or at what cost. The rule is different, however, when one is in the lawful possession of said lands. If, as a tenant in common, one enters upon the lands to which he and his co-tenants in common are entitled, if he only cultivates his own share of such lands, he cannot be made to account for anything; if, however, such tenant in common uses all the arable lands, he is not liable for the rental value, but only for the sum over and above the cost for the making of the crops. See case of *Jones* v. *Massey*, 14 S. C., 292.

In this case cited, James R. Massey, as a tenant in common with others, occupied and used lands belonging to himself and his co-tenants. A sharp controversy arose as to the principles that should govern in taking an account of the rents and profits. It was contended that he was not a good farmer, "of ordinary skill and industry," and, therefore, he should make good the deficiency in the rents and profits caused thereby—

that he should pay the rental value of the lands. But this court held, at page 309: "The accounting should be conducted as follows: Ascertain whether James R. Massey cultivated more of the tillable land than his proportion before election. If not, then there is nothing due by him. If .he did, then he should be charged with the rents and profits of that excess; that is to say, if he rented the land, he should be charged with the rents received; *and if he cultivated them himself, then with the profits actually received from such cultivation, without regard to the skill which he happened to possess as a farmer, or his habits as to industry."* (Italics ours.) We do not know that it is essential that we should add anything additional on this point. In fact, a previous decision of this court, if still upheld, as we now do that of *Jones* v. *Massey, supra,* is an authority to which we bow ourselves, and others must do likewise.

As to the making up the accounts of the trustee with the infant plaintiffs. So far as charges are allowed by the special master, for taxes, improvements, etc., as appear in exhibits for 1887, 1888, 1889, and 1890, we approve all of them except the allowance to the defendant, Glenn D. Peake, for $213.85, and interest thereon paid on R.C. Thompson judgment; Geddes judgment for $59.20, and interest thereon; hire of one mule by trustee, $25; hire of five mules, $125; hire of four mules by trustee, $100; hire of three mules by trustee, $75. These items are proper in the account between Glenn D. Peake and Mrs. Thomson, but should not appear as allowances in his account with the children. We are unable to see how the two payments of the judgments against Mrs. Thomson held by Thompson and Geddes should appear as charges against the infant plaintiffs. Nor are we satisfied that the trustee should be allowed in his account with these infant plaintiffs any allowance for hire of mules furnished by the trustees himself. This last seems to us to be a dangerous precedent—in fact, it is violative of the doctrine in equity that a trustee shall not be allowed any profit to himself in his transactions with his *cestui que trust.* We allow them in the account of Peake with Mrs. Thomson, because she was *sui juris* as to her own estate, and the facts were well known to her, and were not objected to.

We have taken the pains to eliminate these items, because, although the accounts must be reformed and recast, yet it is important to all parties to this contention that there should be a speedy end to this litigation.

Care must be taken in the court below to so frame the decree that the rights of any child or children that may yet be born to these parents may be admitted to a full benefit of their rights under these trust deeds.

In the settlement of the account of the trustee Peake with Mrs. Thomson, if any balance should be found against her, we think Glenn D. Peake has an equity to require a protection to any such balance in his favor, by having the substituted trustee decreed to pay such balance from her share of the rents and profits of "Beauty Spot."

It follows, therefore, that we have sustained the first and second grounds of appeal, but the third, while in a measure sustained, is not entirely so; and as to the fourth, we have fully answered by adhering to the decision of this court in *Jones* v. *Massey, supra.* Our views have been fully set forth hereinbefore on these points, and we will not restate them.

The judgment of this court is, that the judgment of the Circuit Court be modified in accordance with the principles herein announced, and it is ordered, that the cause be remanded to the Circuit Court, with directions that the accounts be recast and reformed in the manner and in the particulars herein fixed, and thereafter for such further orders or decree as may be necessary.

A petition for rehearing was filed, upon which was endorsed, May 11, 1893, the following order

PER CURIAM. We are unable to discover that the court has either overlooked or disregarded any material fact or principle of law brought to its attention at the hearing. There is, therefore, no ground for a rehearing. It is, therefore, ordered, that the petition be dismissed, and the stay of the *remittitur* be revoked.