15572

TURBEVILLE ET AL. v. MORRIS ET AL.

(26 S. E. (2d), 821)

No-vember, 1941.

*Mr. Collins Denny, Jr.,* of Richmond, Va., and *Mr. Clint T. Graydon,* of Columbia, S. C., Counsel for Appellants-Respondents,

*Mr. Walter McElreath,* of Atlanta, Ga., *Mr. J. Morgan Stevens,* of Jackson, Miss., *Mr. Orville A. Park,* of Macon, Ga., *Mr. R. T. Jaynes,* of Walhalla, S. C., *Mr. R. E. Babb,* of Laurens, S. C., and *Mr. Henry R. Sims,* of Orangeburg, S. C., Counsel for Respondents-Appellants,

August 25, 1943.

CIRCUIT JUDGE E. H. HENDERSON, ACTING ASSOCIATE JUSTICE, delivered the unanimous Opinion of the Court:

We are called upon in this case to determine the property rights of the plaintiffs and the defendants in connection with the lot and building of the Pine Grove Methodist Church at Turbeville, in Clarendon County, and in doing so we find that there necessarily arises for consideration the very important question of the validity of the unification of the three great branches of the Methodist faith.

After the adoption by the general conference of the Methodist Episcopal Church, South, in April, 1938, of a plan of union with the Methodist Episcopal Church and the Methodist Protestant Church, dissension arose among the members of the Pine Grove Church as to the wisdom of the pro-

posed unification, and the congregation became divided into two factions. One of these factions, now represented by the plaintiffs, was in favor of union; the other faction, now represented by the defendants and composed of a majority of the members of the Pine Grove Church, was opposed to unification.

Shortly before the annual meeting of the South Carolina conference of the Southern Church, eleven of the twelve stewards of the Pine Grove Church wrote the bishop in charge that the board of stewards would not go into the unified church and would make its own arrangements for a pastor.

In accordance with the rules of the church, in November 1938, at the Hartsville conference, Bishop Purcelle appointed the Reverend L. D. B. Williams as the preacher in charge of the Turbeville-Olanta circuit, which included the Pine Grove Methodist Church. For several months after the arrival of Mr. Williams each faction separately used the church building for religious services at hours which did not conflict, the opponents of unification having other preachers. On April 24, 1939, as the time drew near for the holding of the uniting conference at Kansas City, and as it appeared evident that union would be perfected, three of the trustees of the church, the defendants E. N. Greene, M. J. Morris and E. N. Coker, claiming to be a majority of the board, in order to keep the property from passing under the control of the unified church, executed and delivered an instrument in writing purporting to be a deed whereby they attempted to convey to the other three defendants, H. W. Cole, F. B. Thomas and W. L. Coker, as trustees, the property upon which the Pine Grove Church is located. On May 10, 1939, these three grantees notified Mr. Williams that they were assuming control and direction of the church property, forbade him to use it, and warned him that any such use would be a trespass upon their rights; and thereafter the defendants announced a schedule of religious services to be

held in the church building without the consent or approval of the pastor.

This suit was instituted on May 26, 1939, by some of the officers and members of the church, on behalf of themselves and other members, by C. C. Derrick, district superintendent of the Kingstree district, and by Mr. Williams as pastor, seeking to have the deed cancelled, and to enjoin the defendants in their own right and as representing all other members similarly situated from interfering with the use of the property by the plaintiffs and others in like situation. A temporary restraining order was granted by his Honor, Judge Philip H. Stoll.

A motion was made before his Honor, Judge William H. Grimball, for an order dissolving the temporary injunction. This motion was refused, and the case was referred to Hon. Nathaniel B. Barnwell under a general order of reference. A great deal of evidence was taken by him. He went into the matter with great care and thoroughness, and filed a comprehensive and able report. Exceptions to it were heard by his Honor, Judge Grimball, who after full and mature consideration made a decree confirming the report.

The Circuit Judge and Special Referee held, among other things, that the purported deed of the trustees is illegal and void, and should be cancelled of record; that the defendants and all others claiming under or through them should be permanently enjoined from interfering with the Pine Grove Church property or with the congregation of The Methodist Church worshiping there; that The Methodist Church has no exclusive right to the use of the name Methodist Episcopal Church, South; and that the plaintiffs are not entitled to have the defendants enjoined from using the name.

The plaintiffs except to the holding of the Circuit Judge as to the use of the name Methodist Episcopal Church, South. The defendants allege error in almost all of the other holdings of the Circuit Court.

There is no direct exception by the defendants to the holding of the Circuit Court that the deed of the trustees is invalid. That decision of the Court was clearly correct.

A trustee of church property ordinarily has no power to convey the trust estate unless such power is conferred by the instrument creating the trust, or under an order of Court in a proper proceeding, or where duly authorized by the organic law of the religious society. *Thomson v. Peake,* 38, S. C., 440, 17 S. E., 45, 725; *Presbyterian Church v. Donnom,* 1 S. C. Eq., 154, I Des. Eq., 154, decided in 1778; 65 C. J., 730; 54 C. J., 63.

The Gamble deed gave no power of sale to the trustees, and no Court action authorized it, so we shall look to the rules of the Southern Methodist Church to see what provision is there made in such cases.

Under Paragraph 248 of the discipline of the Methodist Episcopal Church, South, for the year 1938, the trustees of a church may convey, with the consent of the pastor in charge and of the quarterly conference, any church property which has gone out of use or which should be removed to another place, the proceeds to be invested in other church property under the direction of the quarterly conference. In this case the property has not gone out of use, and of course was not to be removed to another place; the conveyance was not authorized by a quarterly conference, and no consent was given by the pastor in charge.

The authority claimed by the trustees for executing the deed was based solely upon the action of a church conference which was called by a majority of the stewards pursuant to public notice after the pastor had refused to call such a meeting. The discipline of the Methodist Episcopal Church, South, sets forth in detail what business may be taken up at church conferences. These matters are quite limited in scope, and it is perfectly clear that a church conference has no power to authorize trustees to dispose of church property.

It is evident, therefore, that the defendant trustees had no authority to execute the deed, and the attempted conveyance is void and of no effect.

Although the pleadings are necessarily quite long, covering one hundred printed pages in the Transcript of Record, and although the testimony is voluminous, we think that a solution of the problems which are presented by the exceptions may be found in an answer to the following major questions:

(1) Who were the beneficiaries under the trust deed of W. J. Gamble by which the property was originally conveyed?

(2) Was unification of the three churches validly accomplished?

(3) Is The Methodist Church entitled to the exclusive use of the name Methodist Episcopal Church, South?

With the deed held to be invalid, the situation is that we have two groups, each claiming the right to the use of the church property, and so we must turn now, under the first issue involved, to examine the trust deed which conveyed this real estate to the Pine Grove Church in order to see who are the owners of the beneficial title.

It appears that this property has been used and occupied as a church by the members of the Methodist Episcopal Church, South, for religious worship since about the year 1854. The first deed to the property, however, was on May 7, 1877, by W. J. Gamble, who conveyed to trustees "for the Methodist Episcopal Church, South, two acres of land in the State and County aforesaid where Pine Grove Church stands.. * * * To have and to hold all and singular the above described plot of land in trust for said Church as a church lot," with warranty to "the said trustees in trust for said Church forever."

Some years later, on October 16, 1897, W. D. Gamble, who was a son of W. J. Gamble, executed to the board of trustees of the Methodist Episcopal Church, South, and

to their successors in office, a deed to the same land on the following trust: "For the use and benefit of the public worship of God. To be applied by the said trustees to the object herein stated under the directions of the General Conference of the Methodist Episcopal Church, South."

It does not clearly appear why the second deed was given, since the first deed creates a· valid trust. The second one would seem to be of little legal effect, except possibly to confirm the earlier conveyance.

For a great many years The Methodist Church had employed a long form of trust clause in its deeds, and that form. was in use in 1854, when the congregation was originally organized; but in 1870 a shorter form was adopted, and so was in force in 1877, when the first Gamble deed was executed. This short form is as follows: "In trust, that said property shall be used, kept, maintained, and disposed of, as a place of divine worship for the use of the ministry and membership if the Methodist Episcopal Church, South; subject to the discipline,, usage, and ministerial appointments of said church, as from time to time authorized and declared by the general conference of said Church, and by the annual conference within whose bounds the said premises are situated."

It is true that the deed of 1877 did not contain literally either of the approved trust clauses, yet the trust clause shows the policy of the church,. and the deed is not repugnant to it. The trust provision in the deed will be given such construction as accords with that policy. In this case it will be given the same interpretation as would be given to a short form trust, for the reason that if a donation is made to a charitable or religious institution by which there is created no trust inconsistent with that in general use, it will be presumed that the grantor intended the property to be applied to the usual use and to the usual trust. *Wilson v. Presbyterian Church of John's Island*, 19 S. C. Eq., 192, 2 Rich. Eq., 192.

Such a form of trust deed and ownership of church property, safeguarding the rights of the conference which has jurisdiction over the individual congregations, is important and necessary under the Methodist policy, with its distinctive feature of an itinerant ministry.

We think, then, that the Circuit Judge and the Special Referee properly concluded that it was the intention of W. J. Gamble that the beneficiary under his deed should be the local congregation of the Methodist Episcopal Church, South, for use by such congregation as a place of worship according to the discipline and subject to the rules and discipline of the Methodist Episcopal Church, South.

This being the case the question is, which one of the factions is the legal successor to the beneficiary under the trust deed? In determining this we should keep in mind the fact that the Methodist Church does not have a congregational or independent form of government. It is a connectional organization, with a centralized form of government, the whole church being a general unit and the local churches being parts of the larger body. The church is governed by quarterly, district, annual, and general conferences, in an ascending scale, and the size of a faction and whether or not it is a majority of the membership of a local congregation is not at all controlling. Zollman's American Church Law, 262. One faction of this congregation is entitled to the use and enjoyment of the property as the true congregation of the church, for the use and benefit of which the property was originally conveyed. It is readily apparent that if the unification was validly effected the united organization, The Methodist Church, is the lawful successor and entitled to the benefits given by the deed to the Southern Church. If the unification is legal then the members of the Pine Grove Church who stand in connection with the successor church and who are organized as members under its discipline, constitute the membership which is entitled

to the use of the trust property. The plaintiffs claim that they, being the adherents of the unified church, are entitled to such use.

If on the other hand the merger is invalid the Methodist Episcopal Church, South, still exists as before, and those who adhere to it are entitled to the use and enjoyment of the property.

This, then, brings us face to face with the question of unification, and leads us to inquire: Who is to determine whether or not the unification was validly made under church law, the civil Courts of South Carolina or the judicial council of the Methodist Episcopal Church, South, the highest judicial body of the religious society?

Fortunately, in determining what is the law of South Carolina on this far-reaching point, we have three decisions of this Court to guide us.

The first case is that of *Harmon v. Dreher,* 17 S. C. Eq., 87, Speers Eq., 87, decided in 1843. Two factions claimed they constituted the true congregation of St. Peter's Church in Lexington County, a Lutheran congregation and a member of the synod of that church. The schism arose over the expulsion of the minister by the synod, whereupon the adherents of the minister undertook to close the church against that portion of the congregation adhering to the synod, and executed a deed attempting to vest the title of the property in their own faction.

In the course of the opinion the Court said:

"The bearing of the case, is to elicit a judgment, which of the parties is the true church of St. Peter's, as incorporated. Each party claims an exclusive right.

\* \* \* \* \*

"It belongs not to the civil power to enter into or review the proceedings of a Spiritual Court. The structure of our government has, for the preservation of Civil Liberty, rescued the Temporal Institutions from religious interference. On the other hand, it has secured Religious liberty from the

invasion of the Civil Authority. The judgments, therefore, of religious associations, bearing upon their own members, are not examinable here; and I am not to inquire whether the doctrines attributed to Mr. Dreher, were held by him, or whether, if held, they were anti-Lutheran; or whether his conduct was, or was not, in accordance with the duty he owed to the Synod, or to his denominations. I have stated the facts, and I have stated the judgment rendered on the facts, and that judgment must be conclusive here.

\* \* \* \* \*

"Where a civil right depends upon an ecclesiastical matter, it is the civil court, and not the ecclesiastical, which is to decide. The civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions, out of which the right arises, as it finds them. \* \* \* Neither can this Court look into the regularity of the process by which the Synod proceeded to its judgment. Every competent tribunal must of necessity regulate its own formulas.

\* \* \* \* \*

"If a portion secede, and the rest, however small their number, adhere, the adherents, by their fidelity, secure their corporate existence, and are entitled to all of the privileges and property of the corporation."

The Court further said that under the law of the Lutheran Church the synod is required to notify the congregation of the expulsion of their pastor, and if the congregation continued to employ him, the synod might cut the congregation off. As this notification had not been given, the bill was dismissed.

The next decision, in the year 1846, is that of *Wilson v. Presbyterian Church of John's Island,* 19 S. C. Eq., 192, 2 Rich. Eq., 192. This case also dealt with two groups in dispute as to which was entitled to certain church property which had been obtained through different sources and held under various trusts. The church had been connected with the presbytery in South Carolina, but about 1838 the pres-

bytery followed the example of the national body, dividing into adherents of the so-called old and new school. A portion of the congregation, desiring to have nothing to do with the controversy, declared the church to be an independent institution, while the minority of the congregation recognized by the presbytery and the general assembly of the old school, claimed that it constituted the true Presbyterian Church of John's Island, and brought this suit to determine its rights to the funds and property of the church. The Court, in discussing the case said:

"The Court disclaims, altogether, any authority to decide on questions of religious faith, or on the fitness and propriety of the forms of government which a church or congregation may adopt, if it inculcates nothing that is prohibited by law or subversive of good morals.

"Within this rule, every society or association, whether the object be religious or secular, has the right to adopt such rules for its government, as to them shall seem best fitted to attain the ends of its institution.

\* \* \* \* \*

"I have disclaimed the authority of the court to examine into the religious faith of any one, for that he must account to another tribunal, but what he has publicly said or done, is capable of being proved without resorting to machinery of an inquisition to extort it from him; and I apprehend that where the right of property depends upon the existence or non-existence of the fact, the civil tribunals must of necessity examine into it."

A more recent case, in 1903, is that of *Morris St. Baptist Church v. Dart,* 67 S. C., 338, 45 S. E., 753, 754, 100 Am. St. Rep., 727.

This was a suit by the church to prevent the defendant from attempting to exercise his function as the alleged pastor of the church. The plaintiffs contended that the defendant had been regularly dismissed. This the pastor de-

nied, and claimed that he was supported by a majority of the members of the church.

The Court said:

"Before entering upon the consideration of the questions of fact involved in the appeal, it is necessary to determine the extent to which this court, as a civil tribunal, can interfere in this unfortunate church controversy.

\* \* \* \* \*

"The civil courts will not enter into the consideration of church doctrine or church discipline, nor will they inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty, untrammeled by state authority. On this principle, the action of church authorities in the deposition of pastors and the expulsion of members is final. Where, however, a church controversy necessarily involves rights growing out of a contract recognized by the civil law, or the right to the possession of property, civil tribunals cannot avoid adjudicating these rights, under the law of the land, having in view, nevertheless, the implied obligations imputed to those parties to the controversy who have voluntarily submitted themselves to the authority of the church by connecting themselves with it. Therefore, where it is admitted, as in this case, that property belongs to a particular church, and the only question is whether the defendant claiming to be pastor should be excluded from its use, this court will only consider whether the church has ordered his exclusion, not whether it was right in doing so. Neither will the court, as a civil tribunal, undertake to determine whether the resolution directing exclusion was passed on in accordance with the canon law of the church, except insofar as may be necessary to do so in determining whether it was in fact the church that acted.

\* \* \* \* \*

"The only questions, then, we have power to consider, are, did the congregation meet, and did it depose the defendant as pastor?"

The rule announced by the Supreme Court of the United States is in substantial accord with that of the South Carolina cases. A leading and widely cited case is that of *Watson v. Jones*, 13 Wall., 679, 727, 20 L. Ed., 666, decided in 1872. In reaching its decision the Federal Supreme Court quotes from and relies strongly upon the case of *Harmon v. Dreher*. Two groups formed in the congregation of the Third or Walnut Street Presbyterian Church, of Louisville, Kentucky, and both claimed the exclusive use of the church property. The Court stated:

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

\* \* \* \* \*

"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence

of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore, be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

The doctrine laid down in the *Watson case* was reaffirmed by the United States Supreme Court in 1918 in the case of *Shepard v. Barkley,* 247 U. S., 1, 38 S. C., 422, 62 L. Ed., 939.

In *Gonzalez v. Roman Catholic Archbishop,* 280 U. S., 1, 50 S. C., 5, 7, 74 L. Ed., 131, the United States Supreme Court declared: "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise."

From these cases it clearly appears that matters of a purely ecclesiastical nature are to be determined by church tribunals alone; and matters purely of property rights by the civil Courts alone; and we agree with the Circuit Judge and the Special Referee that in South Carolina the Courts of law in considering a civil right which is dependent upon an ecclesiastical matter will accept as final the decision of a legally constituted ecclesiastical tribunal having jurisdiction of the matter.

The decree and report accurately hold, also, that this acceptance is not a "blind or perfunctory" one. While not inquiring into the wisdom or correctness .of ecclesiastical decisions, the Court will make sure that the civil right is in fact dependent upon an ecclesiastical matter; it will determine whether the ecclesiastical body had jurisdiction; it will look to see if the steps required by the religious society have been taken; and will inquire into any charges of fraud, collusion, or arbitrariness. It will go no further.

In the present case it is clear that the civil rights of the parties with reference to the church building and grounds are dependent upon an ecclesiastical matter, namely, which faction is the true congregation of the church. That depends upon questions of church law and government. It is equally clear that the judicial council of the Methodist Episcopal Church, South, had jurisdiction to hear and determine this matter. For some time in the past the College of Bishops exercised a right, during the sessions of the general conference, to arrest legislation of the conference which they deemed unconstitutional, this being somewhat in the nature of a veto power. In the year 1934 the church established the judicial council as a supreme body to pass upon all questions of constitutional law which might be referred to it. The validity of unification, and the constitutionality of the steps taken to perfect it, were duly referred to the judicial council by more than the required one-third of the College of Bishops.

We turn, then, to the exceptions of the defendants in which they contend that certain required steps have not been taken, and for a proper understanding of these exceptions it is necessary that we give condensed statement of the procedure of unification, as developed in the testimony before the Referee.

In 1934 the general conference of the Methodist Episcopal Church, South, appointed a commission, which met with similar commissions of the Northern Church and the Methodist. Protestant Church, and on August 16, 1935, there was formulated a plan of union for submission to the three churches. The general conferences of both the Methodist Episcopal Church and the Methodist Protestant Church met in 1936 and approved the plan, which was then submitted to the respective annual conferences of these churches and approved by them.

The general conference of the Methodist Episcopal Church, South, did not meet until May, 1938, and at the 1936 sessions of the annual conferences of this church twenty-five out of the thirty-eight conferences adopted resolutions expressing their desire to vote on the plan of union at the 1937 annual conferences, and asked the bishops to formulate a "common question" on the plan of union to be put before the 1937 conferences. The College of Bishops at a meeting held in Nashville, Tenn., May 1, 1937, formulated the following form of question: "Shall the annual conferences of the Methodist Episcopal Church, South, approve and authorize the adoption of the plan of union of the Methodist Episcopal Church, the Methodist Episcopal Church, South, and the Methodist Protestant Church as proposed and recommended by the commissions on interdenominational relations and church union duly appointed by the general conferences of these three churches, and attached hereto?"

The plan of union was voted on by all thirty-eight of the annual conferences. Thirty-seven of them voted in favor

of the adoption of the plan of union. One annual conference, the North Mississippi conference, voted against approval by a vote of 125 to 117. The total vote of all the members of the conferences was 8,897, of which 7,650 votes were for the approval, and 1,247 against the approval of the plan. The vote of the annual conferences was officially reported to the succeeding general conference which was held in Birmingham, Alabama, and the plan of union was then brought before the conference and adopted by a vote of 434 to 26.

After the adoption of the plan of union by the general conference its legality and validity was referred to the judicial council of the church. Interested parties were given the right to submit objections, and formal hearings were had. An elaborate opinion was delivered by the judicial council, with the unanimous concurrence of its nine members, sustaining the validity of the union, and the following judgment or conclusion was rendered:

"First. The actions of the members of the several annual conferences in approving the plan of union and authorizing its adoption, as reported to this general conference, were and are legal.

"Second. The action of the general conference in ratifying and adopting the plan of union was and is legal.

"Third. The action of the general conference in approving and authorizing the union of the Methodist Episcopal Church, South, with the Methodist Episcopal Church and the Methodist Protestant Church was and is legal.

"Fourth. The union of the three churches and the plan of union have been legally adopted, and the union has been legally authorized in accordance with said plan of union."

After the ruling of the judicial council, the College of Bishops made a "Declaration" to the conference on May 4th, 1938, in which after reciting the action of the annual conferences and of the general conference it was declared that the plan of union had been legally and constitutionally adopted by the Methodist Episcopal Church, South.

The delegates from the annual conferences to the uniting conference were elected in due time, and this uniting conference met in Kansas City in May, 1939. All annual conferences of the Methodist Episcopal Church, South, including the North Mississippi conference, were represented at the uniting conference and a "Declaration of Union" was adopted by a unanimous vote.

Pursuant to authority given in the plan of union, the uniting conference called upon the annual conferences to meet. Sessions of all of the thirty-eight annual conferences were held, including the North Mississippi conference. At each of these conferences, resolutions were adopted which recognized the union of the three churches as an accomplished fact and then adjourned *sine die.*

We shall take up now the exceptions of the defendants relating to procedure.

In the fourth exception it is claimed that the Court was in error in admitting in evidence certain original certificates executed by the officers of the several annual conferences, showing that the form of question prepared by the College of Bishops was submitted to and acted upon by each of the conferences.

At the beginning of the hearings, the parties entered into a stipulation that the printed journals correctly set forth the actions taken at the several annual conferences, and that either party should have the right to introduce in evidence any portions of them without further proof, and that such portions should be conclusively accepted as the action of the conference. When the plaintiffs offered the journals in evidence the defendants objected to them on the ground that they did not show what plan of union was voted on. The plaintiffs then offered in evidence the original certificates signed by the presiding bishop and the secretary of each one of the annual conferences, from the records of the secretary of the College of Bishops at Nashville, showing that the question formulated by the bishops had been acted upon

by each conference. The defendants objected to them, contending that such evidence was in violation of the stipulation. The Special Referee overruled the defendants' objection and admitted the certificates.

In this decision we think that the Referee and trial Judge were correct. We do not understand the stipulation to be that the action of an annual conference is to be determined exclusively or only by the printed journals, but rather that any excerpt or portion of the journals offered in evidence would be conclusive in the sense that it could not be contradicted. They were conclusive as to what they showed, but we do not think that the stipulation would prevent proof by official records of matters which in no way altered or contradicted the journals. The journals showed that all of the annual conferences had voted in one way or another on the question of union, but the secretaries did not copy in the minutes, word for word, the text of the plan of union. Under the stipulation the fact that union had been voted upon was conclusive and could not be contradicted. The certificates, official records made at the time, showing just how the question of union had been voted upon, would not, we think, be in contradiction of the journals but would show matters as to which they were silent or incomplete. The testimony was consistent with the journals, and so did not violate the stipulation. 60 C. J. 74, 80, 84.

In the 14th exception the defendants say that the evidence does not show that the Northern Church and the Methodist Protestant Church adopted the plan of union. Here we have the concurrent finding of fact of the Referee and the trial Judge, and a review of the evidence convinces us that this finding has ample support in the testimony.

"Under the well-settled rule concurrent findings of fact of the Referee and the Circuit Judge will not be disturbed, unless shown to be contrary to the clear preponderance of

the evidence, or controlled or influenced by error of law."
*Williams v. Bruton,* 133 S. C., 395, 131 S. E., 18, 20.

In the 10th exception the defendants urge that a majority vote of the membership of the church is necessary before union may be had. There is no rule in the Methodist discipline requiring or contemplating such action. The defendants point to the fact that votes were taken by the membership when the Southern church divided from the Northern branch in 1844. That was done under peculiar circumstances, and at a time when the annual and general conferences were composed exclusively of preachers, with no lay representation. Certainly one act standing alone, taking place nearly one hundred years ago, cannot be regarded as having established a custom or precedent, or as having become a part of the unwritten constitution of the church. This is the first and only plan of union ever adopted; there was only one separation in the history of the church.

Not being congregational in form of government, it is not required in Methodist churches that the membership act as a whole in determining action to be taken by the church. It is clear, we think, that a vote of the membership is not a step required by the church.

It is contended by the defendants in the fifth exception that the evidence does not show that the plan of union was ever voted upon by the annual conferences of the Southern Methodist Church, the argument being that it does not appear what plan of union was before the conferences. We approve the concurrent finding of fact of the Special Referee and the Circuit Judge that the present plan of union was duly voted upon. The "common question" prepared by the College of Bishops, together with a copy of the plan of union, was sent to each one of the annual conferences. The "common question," with the plan of union attached, was voted upon at each conference. No other plan of union was being proposed for adoption. It is

reasonable to suppose that the members knew of this plan of union, and knew that the general conference was soon to meet at Birmingham and that union would be acted upon. The plan was definitely identified, in the question, as the one for the union of the three named churches, as proposed by the commissions appointed by the general conferences.

"The practice of submitting long and involved propositions in abbreviated form by categorical questions to be answered by yes or no is very common." *Barkley v. Hayes,* D. C., 208 F., 319, 331.

We think that the conclusion of the judicial council, that the actions of the members of the several annual conferences in approving the plan of union was valid, necessarily includes a finding that the vote was properly taken on this question in a manner which was in accord with ecclesiastical law.

In their sixth exception it is urged that the Circuit Judge should have held that the general conference of the Southern Church failed to proceed according to its own rules of order.

We do not think that this objection can be sustained. The general conference is the supreme legislative body of the church. It made its own rules of order, and was competent to determine whether or not they had been obeyed. No objection appears to have been made by any one at the time, and we do not think that a civil Court should say how such an ecclesiastical body shall conduct its deliberations under its own parliamentary procedure and rules.

"The civil courts will not inquire whether in doing so it violated any of its own rules." *Morris St. Baptist Church v. Dart,* above.

In the 11th exception the defendants say that no valid uniting conference was held for the reason that the delegates to it were elected "by orders," that is, the election of the clerical delegates by the clerical members, and the election of the lay delegates by the lay members.

Elections of delegates "by orders" was the established practice of the church, and specifically so authorized since 1870 by its discipline, for the election of delegates to the general conferences. The plan of union did not forbid elections "by orders." It was merely provided that four hundred delegates be chosen in such manner as the general conference might determine, with only the limitation that there should be an equal number of ministers and laymen. The general conference of the Southern church provided that in addition to the twenty members of the commission on union, the remaining three hundred eighty delegates should be elected by the annual conference. Here, again, the resolution did not say how they should be elected, and did not prohibit election "by orders." In each annual conference the entire body acquiesced in the choosing of all the delegates to the uniting conference. No objection was raised in any annual conference or in the uniting conference to this procedure. We do not think that the objection is sound.

Finally on this point the defendants contend, in Exceptions 12 and 13, that no valid sessions of the annual conferences were held after the meeting of the uniting conference, and that in any event no such annual conferences could cure any irregularity in procedure. In the first place, it was not necessary that the plan of union be ratified by the annual conferences, as it had already been regularly adopted. It is true, however, that it was duly provided that the annual conferences should meet, and these meetings were held by each one, including that of the North Mississippi conference. The North Mississippi conference, as did the others, adopted resolutions recognizing the fact of union. It appears, then, that at a legally held meeting, the North Mississippi conference has in fact accepted the plan of union.

We, therefore, think that the Circuit Court correctly found and held that all steps required by the church law have been taken.

No fraud or collusion is even charged. Such a question does not enter into the case, and it is mentioned here only for the purpose of trying to cover all points in logical order.

We turn next to inquire whether or not the decision of the judicial council has been arbitrary, and the only exceptions of the defendants which so charge are the 8th and 9th. It is there claimed that the decision was arbitrary because the adoption of the plan of union would alter the 23rd article of religion of the Methodist Episcopal Church, South, and would alter the procedure established for amending the first restrictive rule of the church; that to make such a change the approval of each annual conference and of two-thirds of the succeeding general conference was required; and that the approval of each annual conference was not had, since the North Mississippi annual conference at its 1937 meeting did not give its approval.

The 23rd article of religion has to do with the church's attitude towards civil government and the duties of members to the civil authorities. The first restrictive rule denies power to the general conference to alter the articles of religion. At the end of the six restrictive rules is given the method for amending them.

This entire matter was presented to the judicial council, and it held that the plan of union did not alter the 23rd article of religion or any other article; that the constitution of the church does not require that an amendment to the articles of religion, or an amendment to the procedure for altering the articles, receive the joint recommendation of all of the annual conferences and two-thirds of the general conference succeeding; but that such action may be taken by three-fourths of the members of the several annual conferences and two-thirds of the general conference; and that even though the North Mississippi conference did not vote in favor of the plan in 1937, yet more than three-fourths of the members of the annual conference did approve it, as well as more than two-thirds of the general conference.

These matters present questions of a purely ecclesiastical nature. They depend upon the constitution and discipline, the faith and doctrine of this great denomination. It may be that in countries which have a State religion such questions could be inquired into by the civil Courts, but with us freedom of religion and the separation of church and state are among our most highly cherished principles. The Courts of South Carolina will not go behind the decisions of ecclesiastical tribunals on questions of this nature, by making the slightest inquiry into their wisdom. We take such decisions as we find them, after making the preliminary inquiries stated above.

We fully agree with the Circuit Court that the decision of the judicial council on these matters of church law and doctrine was not arbitrary. The judicial council had for decision intricate questions of the interpretation of ecclesiastical law extending back for more than a century. It involved the answer to such difficult questions as these: Have the articles of religion been changed? How may an article of religion be amended since the action of the general conference in 1832? Does the first restrictive rule have to be amended by the process laid down in 1808? Was there a legal method since 1832 for amending the articles of religion? Was the action of the general conference in 1906, in adding to or construing the language of the 1832 provision, legal and constitutional under church law? Was the footnote in the discipline to the 23rd article of religion, relating to foreign residence, constitutionally adopted in 1922?

We are convinced that the Court would be altogether unwarranted in saying that a decision on such complicated and abstruse questions is arbitrary. "Arbitrary" means based alone upon one's will, and not upon any course of reasoning and exercise of judgment; bound by no law; done capriciously or at pleasure, without adequate determining principle, nonrational; not governed by any fixed rules or standard. 6 C J. S., Arbitrary, p. 145.

It is also urged that the decision is arbitrary because it is contrary to former decisions of the College of Bishops, some of which consisted of a failure to exercise the veto power. We do not think it at all follows from this that the decision is arbitrary. This was the supreme judicial council of the church, and as such was not obliged to follow prior decisions of other bodies.

Having made all the inquiries the Court may properly make in a case where civil rights depend upon ecclesiastical matters, inquires as to jurisdiction, procedural steps, and arbitrariness, in accordance with law we accept the ecclesiastical decision that unification has been validly accomplished, and that as a consequence the group represented by the plaintiffs constitutes the true congregation of the Pine Grove Church. Applying to that decision the applicable principles of State law governing the use of realty, we hold that the plaintiffs are entitled to the injunction which they seek with respect to the use and enjoyment of the property.

We come now to the last point in the case, the exceptions of the plaintiffs to the decision of the Circuit Judge that neither they nor The Methodist Church are entitled to the exclusive use of the name Methodist Episcopal Church, South.

At the uniting conference a resolution was adopted by that body, one section of which was as follows: "The Methodist Episcopal Church, the Methodist Episcopal Church, South, and the Methodist Protestant Church, in adopting the name 'The Methodist Church' for the united church, do not and will not surrender any right, interest or title in and to these respective names which, by long and honored use and association, have become dear to the ministry and membership of the three uniting churches and have become enshrined in their history and records."

The Circuit Judge and the Special Referee held that this action was beyond the powers of the uniting conference and was void. We agree with that conclusion. The plan of union

made no reference to the subsequent use of the name Methodist Episcopal Church, South. No conference of the Southern Methodist Church took any action in that regard. The uniting conference was not authorized to make any such declaration as was made for the first time at the Kansas City meeting. No grant of power to it even remotely contemplated any such action as this declaration. The uniting conference was powerless to take any action concerning names. Its powers were clearly set out and limited in the plan of union, which merely stated that the united Church should have the name The Methodist Church. In fact, the declaration does not purport to be the act of the uniting conference, but is framed in the language of a declaration of each of the three constituent churches.

It is true that a voluntary association, whether it be religious or secular, has the right to protect the use of the name under which it operates, and to seek an injunction against the use by another association of the same name or of one so nearly similar as to be misleading. Ordinarily, however, no organization has a right to enjoin others from using a name which is not that of the association seeking the injunction. 7 C. J. S., Association, § 13, p. 37; 54 C. J., 13.

The Circuit Judge and the Special Referee concur in a finding of fact that the unified church has abandoned the name Methodist Episcopal Church, South. This concurrent finding of fact is soundly based on the evidence.

It is argued by the plaintiffs that the use of the name by other religious societies would lead to confusion. It seems, however, that the unified church has selected a name which cannot readily be confused with other names. The fact that the word Methodist appears in both names would not necessarily cause confusion, since the words Methodist, or Episcopal, or Protestant appear in very many names of religious associations. The evidence shows

that there are sixteen or seventeen organizations using the word Methodist in their official names.

We do not think that the plaintiffs or the united church have the right to the exclusive use of the name, Methodist Episcopal Church, South, nor that they are entitled to have the defendants enjoined from using the name.

Accordingly, all of the exceptions of both the plaintiffs and the defendants are overruled, and the judgment of the Circuit Court is affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER and FISHBURNE, and CIRCUIT JUDGES T. S. SEASE and A. L. GASTON, ACTING ASSOCIATE JUSTICES, concur.