Curia, per Johnson, Ch.
For the facts of the case, 1 refer to the decree of the circuit court, and shall proceed directly to the consideration of the questions raised by the grounds of appeal, undér certain propositions, which I propose to state in my own way: and for the purpose of avoiding the perplexity which would arise out of presenting in one view the claims of the parties to the property and several funds in controversy, Í propose, in the first place, to consider them in reference to the bequest of Robert Ure alone, supposing that their determination as to that, will conclude all or most of the questions that can arise out of the others.
The bequest of Robert Üre is “ to the sole use and behoof, and for the maintenance of a minister of the Gospel, according to the Presbyterian profession, who is or shall be thereafter, from time to time regularly called, and subscribe the Westminster confession of faith, as the confession of his faith, and shall firmly-believe and preach the same to the people there committed, or %ohich shad be hereafter committed to his care and pastoral inspection.” •
It has not been questioned, and I take it for granted, that Mr, White has been regularly ordained a minister of the Gospel, according to the Presbyterian profession ; that he has signed the Westminster confession of faith, as the confession of his own faith, *210 and that he was regularly called and ordained minister of the Presbyterian church of John’s Island and Wadmalaw ; and that the church united itself to the Charleston Union Presbytery about 1790, and was a component part of it, or some other Presbytery, up' to the 24th December, 1838, when, by a resolution, which was carried by a majority of twelve to three, it declared itself an “ Independent Presbyterian Church, absolved fromall connection with the Charleston Union Presbytery, and every other ecclesiastical body, and placed upon the same ground occupied by other Presbyterian churches in their neighborhood.”
The defendants, being the majority, have organized a congregation, and are in possession of the property and funds of the church, and have retained Mr. White as their pastor. He is said to have been present at that meeting, but whether he directly assented to the resolution or not, does not appear. The complainants, being a minority, have also organized themselves as a church, by the election of officers, and have been recognized by the Presbytery, by the Synod, and General Assembly of the United States, as the Presbyterian Church of John’s Island and Wad-malaw. The causes which led to these proceedings are found in the memorable schism in the Presbyterian Church in the United States, which took place at the meeting of the General Assembly, held at Philadelphia in 1838. The defendants were disinclined to enter into that controversy, and set up for themselves. The complainants, on the contrary, adhered to what is familiarly called the old school Presbyterian party, and insist that they constitute the true church, and as such, are entitled to the funds and property of the church. The court disclaims, altogether, any authority to decide on questions of religious faith, or on the fitness and propriety of the forms of government which a church or congregation may adopt, if it inculcates "nothing'that is prohibited by law or subversive of good morals.
Within this rule, every society or association, whether the object be religious or secular, has the right to adopt such rules for its government, as to them shall seem best fitted to attain the ends of its institution. There is no controversy between these parties as to matters of faith. The faith of both is professedly based on the Westminster confession of faith. They differ only in the form of government, and it is that alone which characterises and distinguishes them from each other, and that is the only distinction. They cannot both have the fund, and therefore it becomes necessary to look into their forms of government, not to deter *211 mine which ought to be preferred, but to ascertain which the testator intended should have it; and the leading question is, whether he intended this charity for the support of a minister of an independent chuuch, professing to believe in the Westminster confession of faith, or the minister of a Presbyterian church, organized according to the form of government. adopted by that church.
The terms used by the testator to designate the person for whose benefit this charity was intended, require, 1st. That he shall be a “ minister oí the Gospel, according to the Presbyterian profession.” 2d. That he shall “ subscribe the Westminster confession of faith, as the confession of his own faith.” 3d. That he shall “ preach the same to. the people committed to his care and pastoral inspection.”
The terms are all of familiar use, and when used in reference to the organization of a Presbyterian church, have an appropriate and well defined meaning. A church is defined, in the form of government of the Presbyterian church, to be a “ number of professing Christians, with their offspring, voluntarily associated together for divine worship,” &c., “ and submitting to a certain form of government.” These have the power of appointing deacons, to whom the secular 'affairs of the church, and the care of the poor are committed, and ruling-elders, who, with the pastor, constitute a judicatory, called the “ church sessions,” which has authority to enforce obedience to the government and discipline of the church, but the organization is incomplete without a pastor. The mode of obtaining one is pointed out in the 15th chap, of the form of government. If the church is satisfied with the ministration of any licentiate, they present him with a call, in which they promise him, among other things, “all proper support, encouragement and obedience in the Lord.” This, if he consent to accept, is presented to the Presbytery to which he belongs, and is regarded there- as a petition from the congregation, that he should be installed their pastor ; and it is expressly declared that no candidate or minister shall receive a call but through the hands of the Presbytery, and if the Presbytery approve it, his installation follows upon his professing, amongst other things, his approbation of the form of government and discipline of the Presbyterian church, and promising to subject himself to his .brethren in the Lord, and the organization of the church is complete. They have, in the language of the will, a minister of the Gospel according to the Presbyterian profession, *212 regularly called, and a people committed to his care and pastoral inspection.
The recognition of the complainants by the Presbytery, the Synod and General Assembly, as a Presbyterian Church, clearly authorizes them regularly to call a minister of the Gospel, according to the Presbyterian profession, and puts them in a condition to be committed to his care and pastoral inspection ; and it will not be questioned that the minister of the church, in conforming to the other requirements of the will, by signing the Westminster confession of faith, <fec., would answer the description of the person designated.
The defendants answer, that they too have a complete organization, and equally come within the description, and being the majority of the former congregation, ought to be regarded as the true church, and the complainants as dissenters from it. But they have thrown off their allegiance to the Presbytery, and all other judicatories of the Presbyterian church, and the question is, whether they now answer the description of the will, as the persons intended to take.
A Presbyterian congregation, with its officers, pastor, elders and deacons, is said to be a complete organization in itself, but the church authorities all agree that it is not independent. Baird, in his work on religion in America, p. 234, chap. 5, says that “ it is a part of an extended whole, living under the same ecclesiastical constitution, and therefore subject to the inspection and control of the Presbytery, whose business it is to see that the standards of doctrines and rules of discipline are adhered to by all the separate churches under its care. It is the court of review and control, over all the sessions of the several churches within its bounds. The supervising body, bound to see that the pastors are faithful in the discharge of their duties, having also authority to license and ordain candidates for the ministry, (fee. To the Presbytery is. superadded the higher judicatories of Synods and General Assemblies, as the means of preserving the standards of doctrine and discipline on a more extended territorial scale.
Such has been the organization of the Presbyterian church in Scotland, from the time of John Knox to this day, and has been substantially followed by the Presbyterian church in England and the United States.
Synods and General Assemblies do not seem to be indispensably necessary, as the Presbytery is, in itself, a complete and in *213 dependent organization. They are only necessary when the number and territorial extent of the churches are too great to be under the control of the Presbyteries, and are calculated to preserve greater uniformity in doctrine and discipline over a wider extent of territory. The Rev. Mr. Forrest, the witness, was right therefore, in saying that there could be no Presbyteiian church without a Presbytery. According to the form of government, no congregation can regularly call a minister, nor can a minister be ordained to a particular church, but through the Presbytery, and that upon his professing to approve of the government and discipline of the Presbyterian church, and consenting to receive and adopt the confession of faith of the church, <&c. The congregation, on their part, promising, among other things, to “ submit to him in the due exercise of discipline.” In this way, and in this alone, can a minister of the Gospel, according to the Presbyterian profession, be regularly called, and the people (the congregation) committed to his care and pastoral inspection— and it follows, that without it, a Presbyterian church could not be perpetuated. The Presbytery could not ordain a minister, nor commit a people to his care and inspection. The Independent churches, on the contrary, maintain that each congregation of Christians, that meet in one house for public worship, is a complete church, has sufficient powei; to act and perform every thing relating to religious government within itself, and is in no respect subject or accountable to other churches. (Buck’s Theo. Dic’n., Article — Independents.) And although they may profess the same faith, teach the same doctrines, and practice the same ordinances as another sect, governed by dilferent rules, they are always marked by something to distinguish them from each other, most frequently by some epithet characteristic of their form of government and discipline. The defendants have assumed the name and character of an Independent church, by which they are distinguished from the Presbyterian church, as clearly as the Roman Catholic Church is from the Protestant Episcopal Church; and it would be a perversion to suppose that by the terms “minister of the Gospel, according to the Presbyterian profession,” the testator meant a minister of an Independent church.
It is not certainly known that any Presbytery existed in the State at the date of the will, nor is there any direct evidence of the existence of one until 1755, nor does it appear when that was organized, and it is argued that the testator could not have contemplated a minister of a regularly organized Presbyterian *214 church, on account of -the inconvenience of this church connecting itself with a Presbytery; and we are therefore ignorant whether it was an Independent church or not, at the date of the will; but upou referring to the clause of the will before cited, it will be seen that the donation was for the support of a minister “ hereafter” to be called, and if it was an Independent church, I should conclude that the donation was intended as an inducement to the church to submit to the authority of Presbytery, and thus to preserve the great landmarks of faith and discipline.
Usage is often called in to aid in the interpretation of words of doubtful import, and may be safely depended on in such cases; but cannot control the obvious intent. The language of Lord Eldon in the Attorney General v. Pearson, is that “ where an institution exists for the purpose of public worship, and it cannot be discovered from the deed, declaring the trust, what form or species of worship was. intended, the court can find no other means of deciding, than through the medium of inquiry into what had been the usage of the congregation in respect to it; and if the usage turns out, on inquiry, to be such as can be supported, I take it to be the duty of the court to administer the trust in such manner as best to establish the usage. But if, on the other hand, it turns out that the institution was established for the express purpose of such form of religious worship, or the teaching of particular doctrines, as the founder has thought most conformable to the Christian religion, I do not apprehend that it is in the power of individuals, having the management of that institution, at any time, to alter the purpose for which it was founded, or say to the remaining members, ‘ we have changed our opinions, and you who assemble in this place for the purpose of hearing the doctrines prescribed by the founder, shall no longer enjoy the benefit he intended for you, unless you conform to the alterations in our opinions.’ The court have nothing to do with the merits of the original system, as it is the right of those who founded the institution, and who gave their money for its establishment, to have the trust continued as it was intended.” — 3 Meriv. 400, 18.
If it be assumed, that this was an Independent church, at the date of the will, and that the minister was provided for, out of this fund, down to the time of its union with the Charleston Presbytery, and that an uniform usage for so long a period, would control the obvious intent of the testator ; yet I collect iron? the decree of the circuit court, Jhat this church was con- *215 neeted with some Presbytery, from about the year 1790, down to the time of secession in 1838, certainly from 1828, so that there is usage against usage, utterly irreconcilable, and we are thrown back on the will to ascertain the intention of the testator. The case of the English Presbyterian congregation, in the Borough of York v. Johnson and others, has been referred to in the circuit court decree, for the purpose of showing, that by the terms “English Presbyterian Congregation,” the founder of the charity did not mean a Presbyterian church, subject to the jurisdiction of Presbytery; and it did not forfeit its rights, by afterwards uniting with a Presbytery, and then seceding from it. The case of Gable and others v. Miller, also cited, is to the same effect. In both, the beneficiary is described by a known and established name, without any addition or qualification, and were left to adopt such form of government as it might think fit, and free to change or alter it, as often as was thought necessary, consistently with the leading objects of the charity. Not so here. The donation in Ure’s will, is not to the John’s Island Church, but for the use of a minister of the gospel, according to the Presbyterian profession, who must have a congregation regularly committed to his care ; and Turner’s deed expressly superadds, a Presbyterian form of government, as a part of the description.
The fact, that Mr. White was regularly ordained minister of this church, and is himself a member of the Presbytery, is relied on, as establishing his claim to be supported out of this charity, although the congregation has repudiated its authority. But a minister alone is not enough ; there must be a people under his care and pastoral inspection, — to whom he must preach the doctrines of the Westminster confession of faith. In the act of ordination, as before shewn, thé congregation promises obedience to the pastor, and the pastor to the Presbytery; and the defendants having violated this undertaking in the act of seceding from the Presbytery, they can no longer be regarded under his care and inspection. He derived his authority, and they the right to a minister, from the Presbytery, upon the pledge of subordination to it; and having thrown off that authority, and assumed the right of self-government, they no longer remain the same people; no longer the flock committed to his care. The people described in the will are wanting, and there is no necessity for a minister.
The question arising under the deed of Robert Turner, is free from all difficulty. The trust there, is for the “minister or pastor of the Protestant Presbyterian Church or congregation of chris- *216 tians, who do or shall usually meet and assemble together, for divine worship, at or in their public meeting-house on John’s Island, during the time he should be minister or pastor of the said congregation, according to the rules and discipline of Presbyterian church government.” He clearly intended not to be misunderstood. It will not be pretended, that the defendants fall within this description, and I think it fairly deducible from this deed that there was at the time a congregation then governed according to the rules and discipline of the Presbyterian church. There were Presbyteries in the United States, at the time of the date of Ure’s will, and however inconvenient it might have been, it is possible that this church might have been united to a Presbytery at home, or in the kingdom of Great Britain. No records of the church are left; and from the nature of things, there exists no human being to tell us how the truth was, and we are at liberty to resort to any circumstance calculated to elicit it.
It does not appear from what source the church derived its title to the land on which the church building was erected, or whether there was any, and what trusts connected with it. But it is sufficient that the church has so long had the possession and use. The rule is, that where a donation to a charitable or religious institution does not create a trust inconsistent with the trusts declared by the original founder, it will be presumed that the donor intended it should be applied to the same use, and neither the trustees or corporation are at liberty to apply it to other objects.
The donation of Thomas Hanscome, of the land, was to the trustees for the use of the church ; and of the money ($6000) directly to the corporation. Nor is there any evidence, that there was any direct trust declared, as to the donation from the John’s Island Society, or the contributions for rebuilding the church; but the necessary inference is, that they were intended for the use of the corporation, and the defendants insist, that being the majority, they have the right to control the application of them. I agree that the majority of a corporation have the right to direct the application of its funds, and 1 hat the court cannot control them in the legitimate exercise of that power; but the question is, Whether the complainants or the defendants now constitute the corporation. The Act of 1785, 8 Stat. 128, by which this church was incorporated, after reciting that the John’s Island Presbyterian congregation, amongst others, had petitioned to be incorporated, enacts that “ the several and respective societies *217 above mentioned, and the several persons who now are or shall hereafter be members thereof respectively, and the successors, officers and members of each of them, shall be, and they are hereby declared to be, severally, one body corporate, in deed and in name, by the name and, style of “ The John’s Island Presbyterian Congregation,” (fee. It was, therefore, the members of the church, and their successor’s, members of the church, who were incorporated, and the defendants having seceded from it, are no longer corporators, and the disposition of these funds belongs to the complainants, who remain members of the church. These, as well as all'the other funds, are said to be in the hands of the treasurer of the' corporation, and are rightfully so, as regards those arising from the bequest of Ure, the grant of Turner, and the lands devised by Hanscome, (all of which are vested in the trustees by name) if the treasurer has been regularly substituted trustee, and for the purposes of this case it may be assumed that he was, nor is it material in whose hands- the funds are — neither the corporation, the church, or any other body of men, or an individual, has the right to apply them to any other objects than those prescribed by the donors. The case of the Attorney General vs. the Governors of the Foundling Hospital, and the Attorney General vs. the Earl of Clarendon, referred to in the circuit court decree, abundantly show that the court will control the execution of the trusts, whether the trustee be an individual or a corporation, and will remove the trustee if he has abused the trust, and substitute others in his place.
A secondary and subordinate proposition, growing out of the grounds of appeal, is, whether evidence was admissible, to show that Mr. White entertained and preached doctrines inconsistent with the Westminster confession, and although it has, in the view which I have taken of the case, become unimportant, I refer to it for the purpose of reserving the question. I have before disclaimed the authority of the court to examine into the religious faith of any one, for that he must account to another tribunal, but what he has publicly .said, or done, is capable of being proved without resorting to machinery of an inquisition to extort it from him; and I apprehend that where the right of property depends upon the existence or non-existence of the fact, the civil tribunals must of necessity examine into it. It is not difficult to conceive of extreme cases, calculated to illustrate the necessity. As if the pastor had openly declared his disbelief in the Westminster confession of faith, and avowed his belief in the doctrines of the Ko *218 ran, and preached them to his congregation. In Henrickson vs. Shotwell, which I have examined in pamphlet form, (p. 41,) Chief Justice Ewing, of New Jersey, asserts, in decided terms, the right and power of the eourt to ascertain, by competent evidence, the religious belief of any man, or set of men, where the rights of property depend on it, and the same rule is clearly deducible from what is said by the Lord Chancellor in the case of the Attorney General vs. Pearson, 3 Meriv. 415.
It will be found necessary to obtain orders for carrying this judgment into effect, and the case is ordered back to the circuit court for that purpose.
Johnston & Dunkin, CC. concurred.