20250

Charlie M. HATCHER et al., Respondents, v. SOUTH CAROLINA DISTRICT COUNCIL OF the ASSEMBLIES OF GOD, INC., et al., Appellants.

(226 S. E. (2d) 253)

*Messrs. Hyman, Morgan & Brown,* of Florence, *for Appellants,*

*E. N. Zeigler,* of Florence, *for Respondents,*

June 24, 1976.

RHODES, Justice:

This class action was instituted by plaintiffs-respondents seeking declaratory and injunctive relief against defendant-appellant, the South Carolina District Council of the Assemblies of God, Inc., and others. Plaintiffs sought, for themselves and those similarly situated, to be declared mem-

bers of the Dillon Assembly of God Church and either the legal or the equitable owners of the Church property. The lower court declared the congregation of the Dillon Church to be the equitable owners of the property and certain plaintiffs to be members of the congregation and granted to them other related relief. We affirm.

The South Carolina District Council of the Assemblies of God, Inc., is an integral part of the General Council of the Assemblies of God, Inc. located in Springfield, Missouri, and is the highest ecclesiastical authority for individual Assembly of God churches in South Carolina. Immediately below the District Council level is the District Presbytery which has general, statewide oversight of church affairs during the interim between the annual sessions of the Council. South Carolina is divided into eight geographical sections and each section is headed by a Sectional Presbyter.

The Council's chief executive officer is the District Superintendent who is also a member and the presiding officer of the District Presbytery. Sectional Presbyters are also members of the District Presbytery. At the time of this action, the Rev. W. G. Dixon was the District Superintendent and the Rev. A. L. Dutton was the Sectional Presbyter for the section in which the Dillon Church is located.

According to the Constitution of the District Council, individual churches are classified into two categories, dependent and sovereign. Generally, dependent churches are congregations which are newly organized and still in the formative state, and have very little autonomy. They are under the general supervision of the District Presbytery until they have "matured sufficiently to accept their full share of responsibility for the maintenance of Scriptural order." Article XI of the Council's Constitution. Sovereign churches have the right to choose their own pastors, elect officers, own property, discipline members, and transact other business pertaining to its life as a local church.

The Dillon Church was organized in March of 1970 as a dependent church and held its initial service in a rented store building. Two years later, the Church held its first service in its present, permanent place of worship, title to which was taken in the name of the District Council as required by its Constitution.

In the course of construction of the present Church properties, certain of the named plaintiffs donated considerable amounts of cash, time, and labor. It is clear that the initiative for the acquisition of the land on which the Church buildings were built and the construction of these buildings is attributable to the then local congregation of the Church and principally by persons who are plaintiffs herein. The only contribution made by the District Council was a donation of $1,000.

The lower court imposed a trust on all the Church property in favor of the congregation of the Dillon Church. No appeal was taken from this portion of the lower court's order.

A year after the Dillon Church was organized, it employed, with the District Presbytery's approval, the Rev. Steven Allen to be its pastor. On February 3, 1972, the congregation voted to give Rev. Allen a two year term as minister. However, during the next few months the members of the Church became dissatisfied with Allen and requested his resignation. He refused to resign and on January 15, 1973, the congregation voted to reduce his term as pastor to one year.

The following day Rev. Dixon and Rev. Dutton met with the leaders of the Dillon Church and were informed of the action taken by the members. Rev. Dixon then announced that he was taking over the supervision of the Church until the District Presbytery could review the matter. The next day the locks on the doors of the Church buildings were changed by action of the District Council.

On January 29, 1973, the members of the Dillon Church were given a copy of a resolution, adopted by the District Presbytery, which vacated all offices of the Church and dissolved its membership. There were twelve or thirteen members of the Church at the time. The resolution specified the following reasons for the action taken: (1) inability to maintain Scriptural order; (2) improper conduction of business affairs; and (3) bringing reproach upon the Assemblies of God by being in a state of confusion.

The expelled members presented a petition to Rev. Dixon on February 7, 1973, requesting a review and rescission of the action of the Presbytery. The petition contained detailed reasons for the requested relief and asked that the expelled members be allowed to appear and be heard at the consideration of the petition. On March 20, 1973, the petitioners were notified that the Presbytery would grant them a hearing on their petition only if they agreed to pay $200 in advance and send only three persons to the hearing. The expelled members refused to agree to these conditions and began conducting religious services elsewhere.

The present action was instituted in July of 1973 by eleven of the expelled members and several others who had joined them in their services. Plaintiffs alleged in their complaint that the District Council wrongfully and in violation of its Constitution and By-Laws dissolved the membership roll of the Dillon Church and declared all offices vacant. They asked the lower court to declare them members of the congregation of the Dillon Church and to restrain the District Council from interfering with their use and occupancy of the Church property.

The joint answer of the defendants denied the material allegations of the complaint and alleged that the actions of the District Council were authorized by its Constitution and By-Laws. The matter was referred to a special master who heard voluminous testimony and filed a lengthy report containing his findings and recommendations. His report was confirmed in all particulars by the lower court.

The lower court and the master found the action of the District Council in dissolving the membership roll of the Dillon Church and vacating its officers to be arbitrary.[1] The Council was ordered by the lower court to reinstate the expelled members as members of the congregation of the Dillon Church, and to allow the congregation to conduct the business affairs of the Church in the same manner as was permitted by the Council before January 16, 1973. The lower court refused to issue an injunction but retained jurisdiction of the action reserving authority to issue supplemental orders if necessary.

The first issue raised is whether the lower court had the authority to review the action of the District Presbytery. One of the leading South Carolina cases on the subject of the proper scope of review by civil courts of ecclesiastical decisions is *Turbeville v. Morris,* 203 S. C. 287, 26 S. E. (2d) 821 (1943). In *Turbeville,* one of the principal cases relied upon for determining the authority of civil courts in this area was *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U. S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929).

In *Gonzalez* Gonzalez claimed the right of appointment to a chaplaincy in the Roman Catholic Church under a will which provided that a member of his family receive the appointment and provided funds for the chaplaincy. The Roman Catholic Archbishop of Manila refused to appoint Gonzalez on the ground that he did not satisfy the qualifications established by Canon Law for that office. Gonzalez brought suit in the Court of First Instance of Manila for a judgment directing the Archbishop to appoint him chaplain. The trial court entered such an order but the Supreme Court of the Philippine Islands reversed and "absolved the archbishop from the complaint." Mr. Justice Brandeis defined the civil court role in the following words:

---

[1] While the master and lower court also characterized the Council's action as being collusive and contrary to law, the finding of arbitrariness is sufficient to support the conclusion reached and our consideration will be confined to this single finding.

"In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Gonzalez v. Roman Catholic Archbishop of Manila, supra.*

The scope of review was delineated in *Turbeville* as follows:

"While not inquiring into the wisdom or correctness of ecclesiastical decisions, the Court will make sure that the civil right is in fact dependent upon an acclesiastical matter; it will determine whether the ecclesiastical body had jurisdiction; it will look to see if the steps required by the religious society have been taken; and will inquire into any charges of fraud, collusion, or arbitrariness. It will go no further."

In *Presbyterian Ch. v. Mary Elizabeth Blue Hull Mem. Pres. Ch.,* 393 U. S. 440, 89 S. Ct. 601, 21 L. Ed. (2d) 658 (1969), the United States Supreme Court commented on the decision in *Gonzalez* as follows:

"It was the archbishopric, not the civil courts, which had the task of analyzing and interpreting church law in order to determine the validity of Gonzalez' claim to a chaplaincy. Thus, the civil courts could adjudicate the rights under the will without interpreting or weighing church doctrine but simply by engaging in the narrowest kind of review of a specific church decision—*i. e.,* whether that decision resulted from fraud, collusion, or arbitrariness. Such review does not inject the civil courts into substantive ecclesiastical matters."

It appears from these decisions that a purely ecclesiastical matter is to be determined by church tribunals alone; that matters purely of property rights by the civil courts alone; that the civil courts, in considering a property right which is dependent upon an ecclesiastical matter, will accept as conclusive the decision of a legally constituted ecclesiastical tribunal having juris-

diction of the matter absent fraud, collusion, or arbitrariness; that in reviewing a specific church decision for proof of fraud, collusion, or arbitrariness, the civil court will not inject itself into substantive ecclesiastical matters.

Our first inquiry, therefore, is whether there is a property right of plaintiffs which was affected by the action of the District Presbytery in dissolving the entire membership of the Dillon Church. The lower court held that title to the local Church property was in the District Council subject to a trust in favor of the local congregation, and that legal title to the property was to be conveyed to the congregation upon the Church attaining the status of a sovereign church. The expelled members were, thus, foreclosed of any right as beneficiaries of the trust by the action of the Presbytery when it ousted them as members of the Congregation of the Dillon Church.

As stated in *Adickes v. Adkins,* 264 S. C. 394, 215 S. E. (2d) 442 (1975): "By a determination of this case, this Court exercises no role in determining ecclesiastical questions. We merely settle a dispute on the question of identity, which in turn necessarily settles a dispute involving the control of property." Likewise, it becomes necessary in this case to determine the identity of the Dillon Church membership in that this Class has been decreed the beneficiaries of the Church property. Thus, the lower court had the authority to review the action of the District Presbytery to determine whether it resulted from fraud, collusion, or arbitrariness. *Turbeville v. Morris, supra.*

The finding by the special master that the action of the District Presbytery was arbitrary was concurred in by the lower court. The nature of this action is equitable and the concurrent finding of arbitrariness "will not be disturbed on appeal unless found to be without evidentiary support or against the clear preponderance of the evidence." *Townes Assoc., Ltd. v. City of Greenville, S. C.,* 221 S. E. (2d) 773 (1976).

After members of the Dillon Church had initially expressed their dissatisfaction with Rev. Allen to Rev. Dixon and Rev. Dutton, Dutton purported to make an investigation of the matter which was at best cursory and superficial. After being requested to resign, Allen telephoned Dutton who told him that he could not be forced to resign by the Church because it was not a sovereign church and recommended that he not resign.

Furthermore, during the lengthy January 16th meeting, Rev. Dixon did not look at the minutes of the meeting of the previous night when the members of the Church had unanimously voted to reduce Rev. Allen's term of office. He had not looked at them at the time of the hearing before the master. Although the January 16th meeting was recorded, neither the transcript of it nor the minutes of the January 15th meeting was introduced into evidence.

With respect to the specific grounds given for the District Presbytery's action, Rev. Dixon and Rev. Dutton were unable to give more than vague explanations for any of them. There was no proof of the failure of the expelled members to maintain the biblical scriptures, the tenets of faith of the organization, or any other aspect of scriptural matters. When asked if there was any departure from the tenets of faith by the members, Dixon responded: "I do not know any I could point to right at this minute."

The testimony of Rev. Dixon and Rev. Dutton reveals that the charge of "inability to maintain Scriptural order" was predicated solely on the expelled members' reluctance to agree with the desire of District officials that Rev. Allen be retained as minister of the Dillon Church. No substantive ecclesiastical matter was involved in this charge.

The charge of "improper conduction of business affairs" was predicated on the contention that the expelled members' meeting on January 15th was held without adequate notice. The meeting was announced the previous day during the Church service and was attended by all the members except

for one person. Moreover, the Dillon Church had not adopted a Constitution or By-Laws prescribing the type of notice required to call a meeting. The Council's Constitution and By-Laws do not contain a specific provision providing for the method of calling meetings in a dependent church.

The charge of "bringing reproach upon the Assemblies of God by being in a state of confusion" is nebulous in nature and is not supported by any evidence other than that relating to the other two charges.

The authority for the action of the District Council in dissolving the Church membership is not specifically granted in either the Constitution or By-Laws of the Council. Moreover, there was no prior written authority for the $200 charge imposed as a condition for a hearing before the District Presbytery.

In *Turbeville v. Morris, supra,* this Court stated that:

" 'Arbitrary' means based alone upon one's will, and not upon any course of reasoning and exercise of judgment; bound by no law; done capriciously or at pleasure, without adequate determining principle, nonrational; not governed by any fixed rules or standard."

We are of the opinion that the concurrent finding of arbitrariness by the master and lower court is supported by the record. The lower court, therefore, properly ordered the District Council to restore to membership the expelled members of the Dillon Church. The additional relief ordered by the lower court was necessary and proper to restore all the rights and privileges exercised by the expelled members as members of the congregation prior to the arbitrary action of the District Council.

Affirmed.

LEWIS, C. J., and LITTLEJOHN, NESS and GREGORY, JJ., concur.