## 2336

Frank C. PEARSON, Respondent v. The CHURCH OF GOD, Appellant.

(458 S.E. (2d) 68)

Court of Appeals

CONNOR, J., concurred in result with separate opinion.

*Thomas A. Bright* and *D. Chris Lauderdale, Haynsworth, Baldwin, Johnson & Greaves,* Greenville, *for appellant.*

*Graves H. Wilson, Jr.,* Greenville, *for respondent.*

Heard Nov. 2, 1994.

Decided Apr. 17, 1995; Reh. Den. June 14, 1995.

HOWARD Judge:

This is a breach of contract action. Frank C. Pearson sued the Church of God for breach of an implied contract alleging the Church wrongfully discontinued his pension benefits. The jury returned a verdict for Pearson for $71,000, which was remitted by the court on its own motion to $70,116 to conform to the evidence. The Church appeals. We reverse.

Pearson was an active minister for the Church from 1952 until he retired in 1986. During his 33-year active ministry, he made the required monthly contribution to the Aged Ministers Pension Plan Fund of four percent of his gross income from the ministry. Following his retirement, Pearson began receiving payments from the Fund.

Payments from the Fund are governed by the *Minutes of the 62nd General Assembly of the Church of God (Minutes)* which read, in pertinent part:

### S62. RETIREMENT PLANS
### I. AGED MINISTERS' PENSIONING PLAN
### A. PENSIONING POLICIES

. . . .

3. Any minister who has been licensed by the Church of God and in active service in the Church for the consecutive past twenty years of his life, at the age of sixty and upon the option of either his part or the part of those officials of the Church to whom he is answerable, or at the superannuating age of sixty-five, shall be eligible to receive an aged minister's pension, provided that he has for those consecutive past years subscribed to the Aged Ministers' Pensioning Plan.

. . . .

19. Any aged minister receiving benefit from the Aged Ministers' Fund whose ministry has been revoked shall cease to draw compensation from the fund. . . .

### S60. DISORDERLY MINISTERS

1. The license of a minister must be revoked when found guilty of adultery or fornication. He shall never be ordained in the Church of God. He shall not be permitted to conduct revivals, preach, or teach for a period of at least three years form the date found guilty. . . .

The contract clearly and unambiguously provides for forfeiture of one's pension upon revocation of one's ministry.[1] Paragraph 3 of S62 gives the eligibility requirements for receiving benefits while paragraph 19 is a more specific provision governing only that class of ministers whose ministries have been revoked. Various other provisions under S60 of the *Minutes* define disciplinary procedures for disorderly ministers. Separate paragraphs govern different offenses. Paragraph 1, set out above, governs the offense of adultery or fornication. It provides for the revocation of a minister's license upon a finding of adultery. Section 61 sets out the procedure, trial and appeal of offending ministers. The procedure is described as follows:

> [T]he State Board, consisting of not less that three Ordained Ministers, appointed by the State Overseer where available, shall give [the offending minister] due notice of time and place where charges will be considered. The minister shall have a right to attend and be heard at that time. If the State Board shall determine that the conduct of said minister warrants such action, his ministry shall at once be revoked.

In September of 1989, the Church revoked Pearson's license after Pearson confessed to the Church's State Trial Board that he had committed adultery. A Revocation of Ministry form was prepared by the Church of God Headquarters in Tennessee. The form reflects the ministry was recalled by "Voluntary surrender." Thereafter, Pearson stopped receiving pension payments.

Pearson sued the Church claiming that although the Church revoked his pastoral "license," the Church did not thereby affectively revoke his "ministry" as set fourth in S62 Paragraph 19 of the *Minutes*. Pearson also argued at trial the Church could not have revoked his ministry by revoking his license because once he retired he had no "ministry" to revoke. Pearson contends that after he retired he had, at most, a "bor-

---

[1] The Church does not concede that it entered into a contract with Pearson. However, the trial judge found as a matter of law that a contract existed between the parties. The Church does not challenge this finding.

rowed ministry" which allowed him to preach at the invitation of other Church ministers.

Pearson's arguments revolve around the meaning to be assigned to the words "license" and "ministry" under the Minutes. As a threshold issue, the Church of God has consistently maintained that this is an ecclesiastical matter, and this court is constitutionally barred from inquiring into the meaning of these words under its doctrine. This court must resolve that issue first, as we are not at liberty to reach a decision premised upon a legal theory which is dependent upon civil judicial authority to intervene.

The South Carolina Constitution, Article 1, Section 2, and the First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, assures religious freedom, without secular interference. The South Carolina Court of Appeals first addressed this issue in the case of *Harmon v. Dreher*, 17 S.C. Eq. (Speers Eq.) 87 (1843). In that case our court recognized the following principle:

> It belongs not to the civil power to enter into or review the proceedings of a Spiritual Court. The structure of our government has, for the preservation of Civil Liberty, rescued the Temporal Institutions from religious interference. On the other hand, it has secured Religious Liberty from the invasion of Civil Authority. The judgments, therefore, of religious associations, bearing upon their own members, are not examinable here. . . . Where a civil right depends upon an ecclesiastical matter, it is the civil court, and not the ecclesiastical, which is to decide. The civil tribunal tries the civil right, and no more, *taking the ecclesiastical decisions, out of which the right arises, as it finds them.*

*Id.* at 120-21 (emphasis added).

Following the *Harmon* decision, the United States Supreme Court first addressed this issue in a diversity case, before the First Amendment had been made applicable to the states through the Fourteenth Amendment. In the case of *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), the Supreme Court, quoting from and relying in part upon the analysis of South Carolina Constitutional law in *Harmon*, ad-

dressed a controversy over real property between different factions of the same church. In its ruling, the Court recognized the following principle:

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter had been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727. The legal principle that eccleasiastical decisions are not proper subjects of inquiry in civil courts thus was first formally recognized under both South Carolina Constitution Article 1, Section 2, and federal law.[2]

The United States Supreme Court next addressed the scope of civil review in cases involving ecclesiastical matters in *Gonzales v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929). In that case a will bequeathed income to the Roman Catholic Church, dependent upon the appointment of a certain individual to a chaplaincy. The Court alluded to limited civil review of ecclesiastical decisions, stating:

> Because the appointment [to the chaplaincy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the ab-

---

[2] As Justice Rehnguist points out in *Serbian Eastern Orthodox Doicese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed (2d) 151 (1976), *Watson* does not rest on First Amendment or other constitutional grounds. *Watson* predated *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and is thus premised upon general federal law rather than state law of the forum in which it is brought. *See Serbian*, 426 U.S. at 710 n. 5, 96 S.Ct. at 2381 n. 5. But the majority in *Serbian* observes that the quoted language was subsequently described in *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed. (2d) 658 (1969), as having "a clear constitutional ring." *Serbian*, 426 U.S. at 710, 96 S.Ct. at 2381.

sence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.

*Id.* at 16, 50 S.Ct. at 7.

The Supreme Court thereafter revisited this issue in *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), in *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed. (2d) 1140 (1960), and again in *Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed. (2d) 658 (1969). Meanwhile, the South Carolina Supreme Court similarly decided cases involving ecclesiastical matters. *See, e.g., Wilson v. Presbyterian Church of Johns Island,* 19 S.C. Eq. (2 Rich. Eq.) 192, 210 (1846) ("The court disclaims, altogether, any authority to decide on questions of religious faith, or on the fitness and propriety of the forms of government which a church or congregation may adopt, if it inculcates nothing that is prohibited by law or subversive of good morals."); *Morris St. Baptist Church v. Dart,* 67 S.C. 338, 342, 45 S.E. 753, 754 (1903) ("The civil courts will not enter into the consideration of church doctrine or church discipline, nor will they inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty untrammeled by state authority."); *Turbeville v. Morris,* 203 S.C. 287, 315, 26 S.E. (2d) 821, 832 (1943) ("These matters present questions of a purely ecclesiastical nature. They depend upon the constitution and discipline, the faith and doctrine of this great denomination. It may be that in countries which have a State religion such questions could be inquired into by the civil Courts, but with us freedom of religion and the separation of church and state are among our most highly cherished principles. The Courts of South Carolina will not go behind the decisions of ecclesiastical tribunals on questions of this nature, by making the slightest inquiry into their wisdom."); *Bramlett v. Young,* 229 S.C. 519, 93 S.E.

(2d) 873 (1956); *Hatcher v. South Carolina Dist. Council of the Assemblies of God, Inc.*, 267 S.C. 107, 226 S.E. (2d) 253 (1976).

Though *Gonzales* referred to limited secular review to prevent "fraud, collusion or arbitrariness," there was no allegation of such in that case.[3] Therefore, the Supreme Court rejected the "arbitrariness" exception to the *Watson* rule in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 48 L.Ed. (2d) 151 (1976), pointing out that the language in *Gonzalez* was dictum. In so doing, the Court made the following analysis, which is dispositive of this case:

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else in to the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the eccleasiastical decisions of church tribunals as it finds them.

*Serbian*, 426 U.S. at 713, 96 S.Ct. at 2382.

We cannot resolve this controversy by in-depth analysis of the substantive criteria by which a matter of fundamental church administrations and polity are decided. The words "license" and "ministry" are by their very nature defined in terms of the authority which they impart to the holder. This necessarily implicates the power to direct the ecclesiastical affairs of the Church. As such, we have no right or authority to make value judgments concerning the meaning and application of such words as "license" and "ministry" to the Church of God or its members. If we applied secular principles of contract construction to this "quintessentially ecclesiastical" matter, we would wade into waters prohibited to us by the First Amendment and South Carolina Constitution Article 1, Section 2.

---

[3] In *Hatcher*, 267 S.C. 107, 226 S.E. (2d) 253, our court recognized this same scope of review.

There is no allegation of fraud or collusion. Pearson voluntarily joined this organization and became subject to its governance in all related matters. To whatever extent the parties had an enforceable contract, the continued receipt of benefits was unambiguously dependent on a ministry. Once the issue of Pearson's ministry was determined adversely to him by the highest Church authority, then the benefits were properly terminated under the contract. Unquestionably, the Church of God acted under its governing authority. Thus the limited application of secular law to this controversy is concluded, and recusal in the ecclesiastical matter is required under *Serbian* and under our Constitution. For this reason, the lower court was in error when the issue was submitted to the jury, and the judgment is reversed.

Reversed.

CURETON, J., concurring

CONNOR, J., concurring in a separate opinion.

CONNOR, Judge (concurring in result only):

I would hold the contract clear and unambiguous as a matter of law and reverse the jury's verdict on that basis.

I do not believe a controversy is automatically shielded from civil review simply because a church is a party. I agree with the majority that *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed. (2d) 151 (1976), sets out the analytical framework in which we must proceed. However, I disagree with their interpretation of *Serbian* and furthermore believe the facts of our case to be quite distinguishable from those in *Serbian.*

*Serbian* involved a thirteen-year battle over the organization of a Diocese. In that case the core of the controversy concerned matters of doctrine and faith. The dispute centered around control of the Diocese and the defrocking of a Bishop. The Bishop, by virtue of his position within the church, was the principal officer of a property-holding corporation. Property disputes were completely incidental to the central issue of who controlled the Diocese. The U.S. Supreme Court held delving into religious issues under these circumstances impermissibly violated the First and Fourteenth Amendments of the United States Constitution.

*Serbian* prohibits "extensive inquiry . . . into religious law and polity," *id* at 708, 96 S.Ct. at 2380, where "the resolution of religious controversies . . . *incidentally* affect[s] civil rights." *Id.* at 710, 96 S.Ct. at 2381 (Emphasis added). In other words, if the controversy is "quintessentially religious," the civil courts must accept the decision of the highest authority of a hierarchical church as final.

However, our case presents the converse situation. Resolution of the controversy here, which has at its heart a civil dispute, requires the application of neutral principles of contract law, and very little inquiry into religious law. We are not asked to engage in an extensive inquiry into the religious law of the Church of God. We have not analyzed the procedural and substantive organization of the Church. We have not questioned the decision of the church judicatory on the ecclesiastical determination to revoke Pearson's ministry. We must determine only the narrow question of the effect of the revocation of Pearson's ministry upon his contractual rights under his Pension Plan.

I would find the contract provisions clear and unambiguous as a matter of law. *Black v. Freeman,* 274 S.C. 272, 262 S.E. (2d) 879 (1980) (where the terms of a contract are clear and unambiguous as a matter of law, construction is for the court rather than the jury). Courts must enforce contracts "regardless of [their] wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Jordan v. Security Group, Inc.,* 311 S.C. 227, 230, 428 S.E. (2d) 705, 707 (1993). Moreover, courts must look at entire agreements, harmonizing provisions where possible. *Popocar Enterprises v. McGowan,* 300 S.C. 178, 386 S.E. (2d) 795 (Ct. Appl 1989). A "[m]ere lack of clarity on casual reading is not the standard for determining whether a contract is afflicted with ambiguity." *Gamble, Givens & Moody v. Moise,* 288 S.C. 210, 215, 341 S.E. (2d) 147, 150 (Ct. App. 1986) (citation ommitted).

The contract here clearly and unambiguously provides for forfeiture of one's pension upon revocation of one's ministry. As the majority states, Paragraph 19 of S62 of the *Minutes* provides ministers whose ministries have been revoked shall "cease to draw compensation from the fund." Moreover, various provisions under S60 define disciplinary procedures for disorderly ministers, and separate paragraphs govern differ-

ent offenses. Paragraph 1, which governs the offense of adultery or fornication, provides for the revocation of a minister's license upon a finding of adultery.

Pearson confessed he committed adultery and the church revoked his license. Pearson admits (1) he was licensed in the Ministry of the Church of God and (2) his license to participate in that ministry was revoked. However, he argues once he retired his ministry ceased and, therefore, his ministry could not be revoked. Yet he concedes he maintained his license as an ordained minister even after retirement. Furthermore, he admits after retirement he remained on the Church's rolls as an ordained minister, made monthly minister reports to the national body, and performed many of the duties of an active minster. Therefore, he basically continued to pursue a ministry in the Church of God after retirement. The trial judge should have directed a verdict in favor of the Church of God, finding as a matter of law the contract clearly and unambiguously allowed the church to terminate Pearson's pension payments because his ministry had been revoked.

I would reverse the verdict on this basis.