478 S.E.2d 849

**Frank C. PEARSON, Petitioner,**

v.

**The CHURCH OF GOD, Respondent.**

**No. 24541.**

Supreme Court of South Carolina.

Heard Oct. 3, 1996.

Decided Dec. 9, 1996.

Thomas A. Bright and D. Chris Lauderdale, of Haynsworth, Baldwin, Johnson and Greaves, Greenville, for Respondent.

Graves H. Wilson, Jr., Greenville, for Petitioner.

TOAL, Justice:

We granted certiorari to review the decision of the Court of Appeals in *Pearson v. The Church of God,* 318 S.C. 417, 458 S.E.2d 68 (Ct.App.1995), which held that the lower court erred by adjudicating this "quintessentially ecclesiastical" matter, in violation of the United States and South Carolina Constitutions. We affirm in result the Court of Appeals' decision to reverse this case.

### FACTUAL/PROCEDURAL BACKGROUND

Frank C. Pearson was a minister in the Church of God ("the Church") from the early 1950's through his retirement in 1986. After retiring, he continued to serve the Church in various capacities. From 1986 until 1989, he preached sermons, received offerings, conducted pastoral visits, and achieved conversions, as evidenced by his monthly submitted reports to the Church's headquarters. On August 28, 1989, Pearson's license was revoked by the Church's State Trial Board because Pearson had committed adultery. The charge of adultery was uncontested: Pearson confessed to, and apologized for, the act. He did not appeal the revocation. On September 14, 1989, the Church's Headquarters issued a "Revocation of Ministry," which stated that "the ministry of Frank C. Pearson has been revoked" on the charge of adultery.

Prior to the revocation of his ministry, Pearson received pension payments from the Church's Aged Ministers' Pensioning Plan. This was a non-vested plan to which ministers and church members contributed. The terms of the Plan were set out in the Minutes of the General Assembly of the Church of God. The Plan declared:

Any minister who has been licensed by the Church of God and in active service in the Church for the consecutive past

twenty years of his life, at the age of sixty and upon the option of either his part or the part of those officials of the Church to whom he is answerable, or at the superannuating age of sixty-five, shall be eligible to receive an aged minister's pension, provided that he has for those consecutive past years subscribed to the Aged Ministers' Pensioning Plan.

The Plan further stated: "Any aged minister receiving benefit from the Aged Ministers' Fund whose ministry has been revoked shall cease to draw compensation from the fund."

From 1986 until 1989, Pearson received approximately $10,-000 in pension payments. The Church discontinued pension payments to Pearson after revocation of his ministry. In 1992 Pearson brought this action against the Church for breach of contract. The case was tried, and the jury returned a verdict of approximately $70,000 in favor of Pearson.

The Church appealed. The Court of Appeals reversed, finding that the controversy could not be resolved without "analysis of the substantive criteria by which a matter of fundamental church administration and polity are decided." *Pearson*, 318 S.C. at 423, 458 S.E.2d at 72. Accordingly, the Court of Appeals concluded that the trial court erred in addressing the controversy and in submitting the matter to the jury. Judge Connor concurred in result, finding that the dispute did not require extensive inquiry into the religious law of the Church of God, but that it could be resolved by application of neutral principles of contract law. *Id.* at 425, 458 S.E.2d at 73.

Pearson petitioned this Court for a writ of certiorari, which was granted. Pearson presents two issues:

1. Did the Court of Appeals err in holding that this action is barred by the First Amendment to the United States Constitution and by South Carolina Constitution Article 1, Section 2?

2. Did the concurrence err in finding that the contract was clear and unambiguous as a matter of law?

## LAW/ANALYSIS

The United States Supreme Court's most recent pronouncements on the subject of judicial review of religious disputes

are *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) and *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In *Milivojevich,* the Court declared that "where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Milivojevich,* 426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162. In that case, resolution of the religious dispute over the defrocking of a bishop determined control of the church's property. The Court declared, "this case essentially involves not a church property dispute, but a religious dispute the resolution of which ... is for ecclesiastical and not civil tribunals." *Id.* at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 163. Quoting *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), *Milivojevich* stated: "[T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Milivojevich,* 426 U.S. at 710, 96 S.Ct. at 2381, 49 L.Ed.2d at 163.

In a number of places in its *Milivojevich* opinion, the Supreme Court made it clear that courts must accept in litigation the religious determinations of the highest judicatories of a religious organization: "[T]he rule of action which should govern the civil courts ... is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* (quoting *Watson v. Jones,* 13 Wall. 679, 20 L.Ed. 666 (1872)); *see also id.* at 711–12, 96 S.Ct. at 2381, 49 L.Ed.2d at 164 ("In the absence of fraud, collusion, or arbitrariness,[1] the decisions

---

1. In *Milivojevich,* the United States Supreme Court rejected the "arbitrariness" exception: "We have concluded that whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular

of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.") (quoting *Gonzalez v. Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929)); *id.* at 713, 96 S.Ct. at 2382, 49 L.Ed.2d at 165 ("[There exists] the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law."); *id.* ("[A] civil court must accept the ecclesiastical decisions of church tribunals as it finds them.").

Three years after *Milivojevich*, in *Jones v. Wolf*, the Supreme Court was presented with the question of which faction of a congregation was entitled to certain church property. The Court affirmed that the First Amendment "prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones*, 443 U.S. at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784. *Jones* reiterated that "the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Id.* The Court stated that the "neutral principles of law" [2] approach used by the Georgia

purposes, no 'arbitrariness' exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense 'arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits. . . ." *Milivojevich*, 426 U.S. at 713, 96 S.Ct. at 2382, 49 L.Ed.2d at 165.

2. *See Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658, 665 ("Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the

Supreme Court in attempting to resolve the property dispute was "[a]t least in general outline ... consistent with the foregoing constitutional principles." *Id.* The approach was described in these terms: "The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603, 99 S.Ct. at 3025, 61 L.Ed.2d at 785. In undertaking an examination of religious documents, such as a church constitution, a civil court

> must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Jones,* 443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785.

The decisions of the South Carolina Supreme Court are consistent in letter and in spirit with the United States Supreme Court opinions discussed above. Our case law has recognized that civil courts "do have jurisdiction as to civil, contract and property rights which are involved in a church controversy," even though they have no jurisdiction of "ecclesiastical questions and controversies." *Bramlett v. Young,* 229 S.C. 519, 537–38, 93 S.E.2d 873, 882 (1956). In *Morris Street Baptist Church v. Dart,* 67 S.C. 338, 45 S.E. 753 (1903), this Court set out the following limitations on judicial involvement in church disputes:

> When a civil right depends upon an ecclesiastical matter, it is the civil court, and not the ecclesiastical, which is to decide. But the civil tribunal tries the civil right, and no more; ... The civil courts will not enter into the consider-

resolution by civil courts of controversies over religious doctrine and practice.").

ation of church doctrine or church discipline, nor will they inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty, untrammeled by state authority. On this principle, the action of church authorities in the deposition of pastors and the expulsion of members is final. Where, however, a church controversy necessarily involves rights growing out of a contract recognized by the civil law, or the right to the possession of property, civil tribunals cannot avoid adjudicating these rights, under the law of the land; having in view, nevertheless, the implied obligations imputed to those parties to the controversy who have voluntarily submitted themselves to the authority of the church by connecting themselves with it.

*Id.* at 341–42, 45 S.E. at 754. Recently, in *Knotts v. Williams,* 319 S.C. 473, 462 S.E.2d 288 (1995), which concerned a dispute among different factions of a congregation, we applied the above rule from *Morris Street Baptist Church.* In *Knotts,* the parties to the litigation asked the trial court to determine the percentage of no-confidence votes required for removal of the pastor of their church and to determine which members were eligible to participate in the vote. We affirmed in *Knotts* that it is not the function of courts to dictate procedures for a church to follow; the courts' function is solely limited to interpreting the final action of the church. We held that because there had been no action by the congregation in regards to the lawsuit, the trial court erred in exercising jurisdiction in the matter.

The following are among the general principles that emerge from analysis of the above United States and South Carolina Supreme Court cases: (1) courts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration; (2) courts cannot avoid adjudicating rights growing out of civil law; [3] (3) in resolving such civil law disputes, courts must accept as final and binding the decisions of the highest religious judicatories as to reli-

---

3. E.g., disputes determined by contract or property law.

gious law, principle, doctrine, discipline, custom, and adminis-
tration.[4]

In applying the above principles to the facts of this
case, we find that it would not violate the federal and state
Constitutions for a court to exercise jurisdiction over this
matter. A civil court is not being asked to adjudicate a matter
of religious law, principle, doctrine, discipline, custom, or
administration. Rather, it is being called to resolve a contrac-
tual dispute. In resolving the dispute, a court must accept as
final and binding the decisions of the highest religious judica-
tories of the Church of God as to religious doctrine and
discipline.

More specifically, the controversy here is not whether it was
proper for the Church of God to revoke Pearson's ministry.
It would not be proper for a trial court (or for this Court) to
determine whether the Church acted consistently with its
religious laws and doctrines, its system of discipline and
administration in revoking Pearson's ministry. That would be
a quintessentially ecclesiastical matter over which a court
could not exercise jurisdiction. This case presents a different
question. The issue here is the effect of the revocation of
Pearson's ministry on the pension agreement he had with the
Church. This case simply requires the application of neutral
principles of contract law and very little inquiry into religious
law.

The contract[5] is very clear that "Any aged minister
receiving benefit from the Aged Ministers' Fund whose minis-
try has been revoked shall cease to draw compensation from

---

4. In religious organizations of a hierarchical nature, courts would
interpret the final actions of the highest ecclesiastical tribunal or body.
*See Milivojevich,* 426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162.
In religious organizations of a congregational nature, courts would
interpret the final actions of the majority of the congregation. *See
Morris Street Baptist Church,* 67 S.C. at 343, 45 S.E. at 754; *see also
Knotts,* 319 S.C. at 478–79, 462 S.E.2d at 291.

5. The trial judge found as a matter of law that a contract existed
between the Church and Pearson. The Church has not challenged this
finding.

54

the fund." Interpretation of an unambiguous agreement is for the court. *Rental Uniform Serv. of Florence, Inc. v. Dudley,* 278 S.C. 674, 301 S.E.2d 142 (1983). If Pearson's ministry has been revoked, then he is not entitled to draw compensation from the Aged Ministers' Fund.

Pearson argues that there exist ambiguities in the contract because: (1) two paragraphs, 3 and 19, of the contract are repugnant and cannot stand together; (2) Pearson, as a retired minister, no longer had a ministry of his own to revoke; and (3) revocation of a license to preach is not the same as revocation of a ministry. The latter two arguments are foreclosed by the fact that a court must accept the doctrinal and administrative determinations of the highest ecclesiastical body of the Church.[6] *See Milivojevich,* 426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162. Here, the Church has made a clear determination that Pearson's ministry has been revoked. This is evidenced by the statement entitled "Revocation of Ministry" issued by the Church's Cleveland, Tennessee Headquarters. It is also revealed by the testimony of O. Wayne Chambers, the director of pension programs and legal affairs at the Tennessee Headquarters. Accordingly, it would be improper for a court to engage in the task of defining "ministry" and "license."

The only argument that remains for us to consider is the first one, namely, that two paragraphs of the contract, paragraphs 3 and 19, are inconsistent. Pearson attempts to fabricate an inconsistency where none exists. Paragraph 3 sets forth the general requirements of eligibility; paragraph 19 describes what occurs when a minister receiving benefits has his ministry revoked. There is no incongruity. Pearson began receiving benefits under paragraph 3, and these benefits were discontinued under paragraph 19 when his ministry was revoked. Thus, because the contract unambiguously allowed the Church to discontinue Pearson's pension payments as a result of the revocation of his ministry, the trial court should have directed a verdict in favor of the Church.

---

6. The Church of God has a hierarchical structure.

CONCLUSION

Accordingly, the decision of the Court of Appeals in reversing the lower court is **AFFIRMED IN RESULT.**

FINNEY, C.J., and MOORE, WALLER and BURNETT, JJ., concur.