### 24325

William E. KNOTTS, Eugene E. Bolen, Sr., Tom P. Scott, W.O. Schumpert, Ray Watkins, James L. Boyleston, and Frank Fanning, Individually and Representing all First Baptist Members Voting to Terminate the Pastor, Appellants/Respondents v. Doug WILLIAMS, Byron Reed, First Baptist Church of Williston Board of Deacons and Other unnamed Defendants, of whom Doug Williams is Respondents, of whom, Byron Reed, First Baptist Church of Williston Board of Deacons, and Other unnamed Defendants are Respondents/Appellants.

(462 S.E. (2d) 288)

Supreme Court

*Wilburn Brewer, Jr.* and *Marcus A. Manos,* both of *Nexsen, Pruet, Jacobs & Pollard,* Columbia; and *Orin G. Briggs,* of Irmo, *for appellants/respondents.*

*S. Jahue Moore* and *Henry Deneen,* both of *Kirkland, Wilson, Moore, Allen, Deneen & Taylor,* West Columbia, *for respondent Williams.*

*Barry H. Johnson,* of *Johnson, Johnson, Whittle, Snelgrove & Weeks,* Aiken; and *Eugene C. Fulton, Jr.,* Columbia, *for respondents/appellants.*

Heard Feb. 7, 1995.

Decided Sept. 19, 1995.

TOAL, Justice:

This Litigation is the product of an intra-congregational dispute between two factions at First Baptist Church of Williston. The Plaintiffs, led by William E. Knotts, seek to remove Defendant, Pastor Doug Williams. Defendants want the pastor to remain.

The appeal arises from orders issued by the trial judge in an attempt to bring about an arbitrated settlement of this tragic church division.

This case raises important questions about the propriety and limits of governmental intrusion into the internal affairs of a church.

For the reasons below discussed, we conclude that the dispute presented to the Court by the Plaintiffs is not one the

Court should be involved in resolving. Accordingly, we vacate the order of the trial judge and direct that this action be dismissed.

## FACTS

For several years, the membership of the First Baptist Church of Williston (Church) has been divided by a dispute as to whether to retain or terminate the services of its pastor, Reverend Doug Williams (Williams).

At one point in the dispute, Williams negotiated a tentative agreement with the Board of Deacons whereby he would resign in return for a severance package. This proposal required approval by the full congregation. A congregational meeting was held on January 24, 1993 to present the proposed resignation and severance package. At this time the total membership of the church was 423. There were 207 members present. As it developed, 108 members voted not to accept Williams resignation, 92 voted to accept and 7 abstained. As a result, Williams was retained as pastor.

During the balance of 1993, the Church continued to be divided over the issue of its pastor. A regular congregational business meeting was scheduled for 7:00 p.m., Sunday, January 9, 1994. A group of members led by William E. Knotts notified the pastor and the Board of Deacons that they intended to present a motion to terminate the pastor's services at this meeting. The Chairman of the Board of Deacons, Byron Reed (Reed), in cooperation with Williams cancelled this meeting.

Notwithstanding the cancellation, eighty-eight members of the congregation met on the evening of January 9, 1994 at the previously appointed hour and eighty-three voted to remove Williams as pastor. Williams and Reed refused to recognize the vote of this meeting contending the meeting had been properly cancelled and further the required 25 percent quorum was not present. On January 20, 1994, Williams E. Knotts and other individuals who voted to terminate the pastor (Knotts group) brought this action against Reed, First Church of Williston Board of Deacons, and other unnamed Defendants (collectively the Reed group) and Williams to enforce the January 9, 1994 vote to terminate Williams. The Knotts group also sought a temporary restraining order enjoining the Reed group and Williams from interfering with the Knotts group in

the operation of Church.

On January 27, 1994, after a hearing, the trial judge declined to issue a temporary restraining order but persuaded the parties to this lawsuit to enter into mediation. The parties met for several mediation sessions. Thereafter, the mediator submitted a report to the trial judge in which the parties agreed that the congregation would hold a "no-confidence" vote on the pastor. The parties could not agree on which members were eligible to participate in the vote or on the percentage of no confidence votes required to remove Williams. The parties to this lawsuit agreed the trial judge was to determine the percentage vote necessary under the Church's bylaws for the vote and who would be eligible to vote. No agreement, however, was ever approved by the church membership in this regard.

The Reed group argued the bylaws required a three-fourths vote of the congregation for a "no-confidence" vote, while the Knotts group argued a majority vote is needed. On March 16, 1994, after a hearing, the trial judge held a two-thirds vote is required for a "no-confidence" vote under the Church's bylaws. On March 22, 1994, the Knotts group filed a Rule 59 motion for reconsideration in which they contended that the trial court erred in construing *Roberts Rule of Order* and the Church By-Laws to require a two-thirds vote to terminate Williams. On March 25, 1994, the trial judge denied the motion and affirmed its prior order.

The Knotts group and the Reed group appealed the March 16, 1994 order of the trial judge.

## *LAW/ANALYSIS*

The Reed group argues this Court is without subject matter jurisdiction to dictate procedures for the Church to follow in terminating its pastor. We agree.

Internal dispute among members of a church present some of the most difficult questions involving the limits of governmental intrusion into the religious affairs of its citizens. Freedom of Religion is among the most fundamental of the guarantees of liberty contained in the Bill of Rights. It is no accident that the very first clause of the First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

U.S. Const. Amend. I. Article I, § 2 of the South Carolina Constitution mirrors the federal constitutional provision.

South Carolina has a long history of concern for the protection of religious freedom. The earliest charter given by Charles II to the Lords Proprietors of Carolina in 1663 contains religious freedom provisions recognizing the need to create a governmental climate of toleration for a variety of religious beliefs and practices.

Although developed somewhat incrementally, the creation of laws supporting a climate of religious freedom in South Carolina in Colonial Times as well as the earliest days of Revolution and of Independence was a product in part of adherence to the sanctity of individual expression and in part of pragmatic economic considerations. To the extent that South Carolina as a colony and as a state became known for its atmosphere of religious tolerance, its ability to attract numerous settlers with skills needed to promote its developing economy was enhanced. Thus, religious freedom in the South Carolina is rooted in part in idealism and in part in economic development.[1]

To preserve and foster this most cherished of freedoms, South Carolina and the federal government chose a constitutional prohibition against governmental interference with its citizens' free exercise of religious belief. The maintenance of governmental neutrality in the court resolution of church disputes has been the consistent and dominant theme of the South Carolina cases in this area.[2]

In *Morris Street Baptist Church v. Dart*, 67 S.C. 338, 45 S.E. 753 (1903), a case involving the dismissal of a pastor, this Court set out the following limitation on judicial involvement in church disputes:

> When a civil right depends upon an ecclesiastical matter, it is the civil court, and not the ecclesiastical, which is to decide. But the civil tribunal tries the civil right, and no more; . . . The civil courts will not enter into the consideration of church doctrine of church discipline, nor will they

---

[1] Professor James Underwood, Strom Thurmond Professor of Law at the University of South Carolina Law School, details this background in Chapter 1 of Volume III of his authoritative history of the State Constitution. James L. Underwood, *The Constitution of South Carolina*, Volume III 3-15 (1992).

[2] Underwood, *supra*, Volume III 145-162.

> inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty, untrammeled by state authority. On this principle, the action of church authorities in the deposition of pastors and the expulsion of members is final. Where, however, a church controversy necessarily involves rights growing out of a contract recognized by the civil law, or the right to the possession of property, civil tribunals cannot avoid adjudicating these rights, under the law of the land; having in view, nevertheless, the implied obligations imputed to those parties to the controversy who have voluntarily submitted themselves to the authority of the church by connecting themselves with it.

*Id.* at 341-42, 45 S.E. at 754. The Court held the only questions which it had the power to consider were "did the congregation meet, and did it depose the defendant as pastor." *Id.* at 343, 45 S.E. at 754.

Here, the parties to this litigation asked the trial judge to determine what percentage of no-confidence votes was required to remove Williams and which members were eligible to participate in the vote.[3] In a well-meaning attempt to bring about an arbitrated settlement of this tragic church division, the trial judge agreed to make this determination.

It is not the function of courts, however, to dictate procedure for a church to follow. *Bowen v. Green*, 275 S.C. 431, 272 S.E. (2d) 433 (1980). The court's function is solely limited to interpreting the final action of the church. *Morris Street, supra.*

---

[3] In its complaint, the Knotts group asked the court to enforce the January 9, 1994 vote to terminate Williams. The Knotts group abandoned this issue when it agreed in mediation that the trial judge would only determine which members were eligible to participate in the no-confidence vote and what percentage vote was required to remove Williams. We note, however, that even if this issue had been preserved, the record established there was not a quorum present at the january 9th vote and, therefore, the vote was invalid.

The First Baptist Church of Williston is governed congregationally.[4] *See Bowen* at 435, 272 S.E. (2d) at 435 (1980) (Baptist churches are generally governed congregationally). Therefore, the court only has jurisdiction to review actions taken by the congregation. There has been *no action* by the congregation in regards to this lawsuit. Neither the congregation nor the Church is named as a party to this lawsuit. The congregation never approved an agreement to have the court determine the percentage vote necessary to terminate its pastor and who would be eligible to vote. Rather, the parties that consented to this agreement were the Board of Deacons and a group of members of the Church, clearly not the governing authority of the Church.[5] Because no action has been taken by the congregation, the trial judge improperly exercised jurisdiction in this matter.[6] *Morris Street, supra.* The trial judge's order is, therefore,

Vacated.

FINNEY, C.J., MOORE, WALLER, JJ., and A. LEE CHANDLER, Acting Associate Justice, concur.

---

[4] Neither party asserts that the church had adopted an alternative means of church government.

[5] We note that this case deals with a congregational church. The situation is substantially different when a hierarchical church is involved.

[6] Based on our holding, we need not address the parties' remaining arguments.